No. 16 April 30, 2015 167

IN THE SUPREME COURT OF THE
STATE OF OREGON

Everice MORO;
Terri Domenigoni; Charles Custer; John Hawkins;
Michael Arken; Eugene Ditter; John O'Kief;
Michael Smith; Lane Johnson; Greg Clouser;
Brandon Silence; Alison Vickery; and Jin Voek,
*Petitioners,*

*v.*

STATE OF OREGON;
State of Oregon,
by and through the Department of Corrections;
Linn County; City of Portland;
City of Salem; Tualatin Valley Fire & Rescue;
Estacada School District; Oregon City School District;
Ontario School District; Beaverton School District;
West Linn School District; Bend School District;
and Public Employees Retirement Board,
*Respondents,*

*and*

LEAGUE OF OREGON CITIES;
Oregon School Boards Association;
and Association of Oregon Counties,
*Intervenors,*

*and*

CENTRAL OREGON IRRIGATION DISTRICT,
*Intervenor below.*

S061452 (Control)

Wayne Stanley JONES,
*Petitioner,*

*v.*

PUBLIC EMPLOYEES RETIREMENT BOARD;
Ellen Rosenblum, Attorney General;
and Kate Brown, Governor,
*Respondents.*

S061431

Michael D. REYNOLDS,
*Petitioner,*

*v.*

PUBLIC EMPLOYEES RETIREMENT BOARD,
State of Oregon; and Kate Brown,
Governor, State of Oregon,
*Respondents.*

S061454

George A. RIEMER,
*Petitioner,*

*v.*

STATE OF OREGON;
Oregon Governor Kate Brown;
Oregon Attorney General Ellen Rosenblum;
Oregon Public Employees Retirement Board;
and Oregon Public Employees Retirement System,
*Respondents.*

S061475

George A. RIEMER,
*Petitioner,*

*v.*

STATE OF OREGON;
Oregon Governor Kate Brown;
Oregon Attorney General Ellen Rosenblum;
Public Employees Retirement Board;
and Public Employees Retirement System,
*Respondents.*

S061860

On petition for judicial review of legislation.*

Argued and submitted October 14, 2014.

Gregory A. Hartman, Bennett, Hartman, Morris & Kaplan, LLP, Portland, filed the briefs and argued the cause for petitioners Everice Moro, Terri Domenigoni, Charles

_____

\* Senate Bill 822, signed into law May 6, 2013, and Senate Bill 861, signed into law October 8, 2013.

Custer, John Hawkins, Michael Arken, Eugene Ditter, John O'Kief, Michael Smith, Lane Johnson, Greg Clouser, Brandon Silence, Alison Vickery, and Jin Voek. With him on the briefs was Aruna A. Masih.

George A. Riemer, Sun City West, Arizona, argued the cause and filed the briefs on behalf of himself.

Michael D. Reynolds, Seattle, Washington, argued the cause and filed the briefs on behalf of himself.

Wayne Stanley Jones, North Salt Lake City, Utah, filed the briefs on behalf of himself.

William F. Gary, Harrang Long Gary Rudnick P.C., Portland, argued the cause and filed the briefs for respondents Linn County, Estacada School District, Oregon City School District, Ontario School District, West Linn School District, Beaverton School District, Bend School District and intervenors Oregon School Boards Association and Association of Oregon Counties. With him on the brief was Sharon A. Rudnick.

Keith L. Kutler, Assistant Attorney General, Salem, argued the cause and filed the brief for State respondents. With him on the brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Matthew J. Merritt, Assistant Attorney General.

Harry Auerbach, Chief Deputy City Attorney, Portland, filed the brief for respondent City of Portland.

Edward H. Trompke, Jordan Ramis PC, Lake Oswego, filed the brief for respondent Tualatin Valley Fire and Rescue.

W. Michael Gillette, Schwabe, Williamson & Wyatt, PC, Portland, argued the cause and filed the brief for intervenor League of Oregon Cities. With him on the brief were William B. Crow, Sara Kobak, and Leora Coleman-Fire.

Craig A. Crispin, Crispin Employment Lawyers, Portland, filed the brief for *amicus curiae* AARP.

Sarah K. Drescher, Tedesco Law Group, Portland, filed the brief for *amicus curiae* International Association of Fire Fighters.

Before Balmer, Chief Justice, and Kistler, Walters, Linder, Brewer, and Baldwin, Justices, and Haselton, Chief Judge of the Oregon Court of Appeals, Justice *pro tempore*.**

BALMER, C. J.

Brewer, J., concurred and filed an opinion.

Oregon Laws 2013, chapter 53, sections 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10, are declared unconstitutional under Article I, section 21, of the Oregon Constitution insofar as they affect retirement benefits earned before May 6, 2013. Oregon Laws 2013, chapter 2, sections 1, 2, 3, 4, 5, and 6 (Special Session), are declared unconstitutional under Article I, section 21, of the Oregon Constitution insofar as they affect retirement benefits earned before October 8, 2013. Oregon Laws 2013, chapter 2, section 8 (Special Session), is declared void. Petitioners' requests for relief challenging Oregon Laws 2013, chapter 53, sections 11, 12, 13, 14, 15, 16, and 17, are denied.

_____

** Landau, J., did not participate in the consideration or decision of this case.

**BALMER, C. J.**

Petitioners are active and retired members of the Public Employee Retirement System (PERS) challenging two legislative amendments aimed at reducing the cost of retirement benefits—Senate Bill (SB) 822 (2013), which eliminated income tax offset benefits for nonresident retirees and modified the cost-of-living adjustment (COLA) applied to PERS benefits, and SB 861 (2013), which further modified the PERS COLA. Or Laws 2013, ch 53 (SB 822); Or Laws 2013, ch 2 (Spec Sess) (SB 861). Petitioners raise numerous challenges to the amendments but argue primarily that the amendments impair their contractual rights and therefore violate the state Contract Clause, Article I, section 21, of the Oregon Constitution, and the federal Contract Clause, Article I, section 10, clause 1, of the United States Constitution.

On that issue, respondents and intervenors, which include the State of Oregon and other public employers participating in PERS (collectively, respondents), contend that the amendments in SB 822 and SB 861 modify noncontractual and insubstantial PERS benefits and that, even if the amendments impair constitutionally protected contractual rights, the impairment is justified on public purpose grounds. Specifically, respondents argue that the amendments were a reasonable and necessary response to increases in employer contribution rates required by the Public Employee Retirement Board (the board), which administers PERS. Those rate increases stem from the recession that caused the PERS fund to lose 27% of its value in 2008. To make up for those losses and to restore the funding needed to pay future benefits, the board increased the contribution rates imposed on respondents and other participating employers. Respondents insist that those rate increases are sufficiently burdensome to justify the benefit reductions and excuse any contractual impairment that might result.

We have considered the parties' arguments and conclude that nonresident petitioners have no contractual right to the income tax offset payments and, therefore, that the legislature did not violate the state or federal Contract Clauses by eliminating those payments to nonresident

retirees in SB 822. We also reject petitioners' other challenges to the elimination of the income tax offset payments for nonresident retirees.

Our assessment of the COLA amendments is more complicated. Before the amendments at issue in this case, the COLA provisions had been in place and unchanged for 40 years. Indeed, a substantial number of PERS retirees worked their entire careers while the pre-amendment COLA provisions were in effect and then retired. We conclude that petitioners have a contractual right to receive the pre-amendment COLA for benefits that they earned *before* the effective dates of the amendments—that is, benefits that are generally attributable to work performed before the amendments went into effect. Thus, insofar as they apply retrospectively to benefits earned before the effective dates, the COLA amendments impair the PERS contract and violate the state Contract Clause. Petitioners, however, have no contractual right to receive the pre-amendment COLA for benefits that they earned *on or after* the effective dates of the amendments—that is, benefits that are generally attributable to work performed after the amendments went into effect. In the absence of specific contract rights outside the PERS statutes, the COLA amendments do not violate the state or federal Contract Clauses when applied to benefits earned on or after the effective dates.

Further, we reject respondents' substantiality and public purpose arguments attempting to justify that impairment. Because the COLA is compounded annually, the COLA grows over time to become a significant part of the PERS retirement benefits. Even seemingly small changes to the COLA rate, like those at issue in this case, can have a substantial impact on the value of the benefits. Although there is no doubt that the legislature passed SB 822 and SB 861 to address legitimate public policy concerns and with an appropriate sensitivity to the impact that the amendments would have on retirees, those concerns do not establish a defense to the contractual impairment that the amendments effect. The public purpose defense that respondents ask this court to recognize imposes a high bar to justify the state's impairment of a state contract, like PERS, and the record in this case does not meet that standard.

We therefore hold that respondents constitutionally may cease the income tax offset payments to nonresidents as set out in SB 822 and that respondents also constitutionally may apply the COLA amendments as set out in SB 822 and SB 861 prospectively to benefits earned on or after the effective dates of those laws, but not retrospectively to benefits earned before those effective dates.[1] Subject to applicable vesting requirements, PERS members who have worked for participating employers both before and after the relevant effective dates are entitled to a COLA rate that is blended to reflect the different COLA provisions applicable to benefits earned at different times.

## I.  BACKGROUND

A.  *Jurisdiction and Evidentiary Record*

The legislature conferred original jurisdiction on this court to determine whether SB 822 and SB 861 are invalid, unconstitutional, or a breach of the contracts between PERS members and their employers. *See* SB 822, § 19(1) (conferring original jurisdiction on this court); SB 861, § 11(1) (same). In furtherance of that jurisdiction, we appointed Multnomah County Circuit Court Judge Stephen K. Bushong to act as special master. *See* SB 822, § 19(6) (authorizing the court to appoint a special master); SB 861, § 11(6) (same). As special master, Judge Bushong presided over an evidentiary hearing and prepared a thorough report containing his recommended findings of fact. *See* Special Master's Final Report and Recommended Findings of Fact (Apr 30, 2014) (Special Master's Report). The parties have not materially challenged the special master's recommended findings, which we have adopted unless otherwise noted.[2]

---

[1] Because we hold that the COLA amendments may not be applied retrospectively, we also void, for the reasons set out below, 357 Or at 232-33, the provisions of SB 861 allowing for certain supplemental payments to retirees that were intended to mitigate the impact of that retrospective application.

[2] We previously considered a motion to disqualify the sitting judges of the Oregon Supreme Court from hearing this case and a motion to disqualify Judge Bushong from acting as special master on the ground that those individuals are PERS members and therefore have an interest in the outcome of this case. *Moro v. State of Oregon*, 354 Or 657, 661-62, 320 P3d 539 (2014). We denied those motions and held that the "rule of necessity" precluded disqualification. *Id.* at 672. "[U]nder the 'rule of necessity,' if the only judges authorized by law to decide a case all have an interest in the outcome of the case, that interest is not disqualifying

B.  *PERS Funding and Benefits*

PERS has been "a contractual benefit of public employment[] since 1945." *Strunk v. PERB*, 338 Or 145, 157, 108 P3d 1058 (2005). Employees become PERS members after working six months in a qualified position for the state or other participating public employer. ORS 238.015(1); ORS 238A.100(1); ORS 238A.300(1). There are more than 330,000 members in the PERS system, including current employees (active members), unretired former employees (inactive members), and retired former employees (retired members).[3] And there are about 900 participating public employers, including all state departments and agencies, all school districts, and nearly all units of local government.

The board administers PERS and serves as trustee of the Public Employee Retirement Fund (the fund), which the board uses to pay member retirement benefits. ORS 238.660(1); *see also White v. Public Employees Retirement Board*, 351 Or 426, 437-38, 268 P3d 600 (2011) (discussing the standards for the board when serving as a trustee). As of December 2013, the fund had approximately $68 billion in assets. The board is responsible for ensuring that the fund's assets are sufficient to pay the benefits owed to PERS members.

The board attempts to prefund each member's benefits by collecting contributions both from that member and from his or her employer while the member is working. The board then invests those contributions over the course of the member's career and collects the income from those investments. As a result, the board relies on three sources to generate the fund's assets: member contributions; employer contributions; and investment income. *Strunk*, 338 Or at 157. Ultimately, the board must generate sufficient assets from those three sources to equal the retirement benefits owed to PERS members.

---

because judges have 'the absolute duty' to 'hear and decide cases within their jurisdiction.'" *Id.* at 667 (quoting *United States v. Will*, 449 US 200, 215, 101 S Ct 471, 66 L Ed 2d 392 (1980)).

[3] We take the facts from the Special Master's Report or other records admitted by the special master as evidence in the hearing that he conducted.

Some retirement plans are "defined contribution plan[s]." *See* 26 USC § 414(i) (defining defined contribution plans). A defined contribution plan defines how much the member and employer contribute but does not promise that a member will receive a particular amount in benefits at retirement. Generally, the plan administrator deposits the contributions into an account for the member and invests those contributions. At retirement, the member's benefit is whatever money is in the member's account. Consequently, the assets of a defined contribution plan always equal the benefits owed to members.

The alternative to defined contribution plans are "defined benefit plan[s]." *See* 26 USC § 414(j) (defining defined benefit plans). As the name suggests, a defined benefit plan defines the benefit first, and then the plan administrator attempts to set the current contribution rates to pay for those future benefits. Setting the proper contribution rates often requires an administrator to make numerous projections about future events that might affect the costs of the retirement benefit. The events that the plan administrator needs to project depend on the nature of the defined benefits. Those projections are often complex and frequently include future compensation levels of members, life expectancies of members, and future rates of return on plan investments. The plan administrator then revises those projections as needed to reflect the actual events that the administrator previously projected. Those revisions indicate whether the plan administrator previously overestimated or underestimated the contributions needed to fund future benefits. If the plan administrator overestimated, then future contribution rates will be lower. If the plan administrator underestimated, then future contribution rates will be higher.

PERS is a defined benefit plan, although it has some components of a defined contribution plan. *See* ORS 238.600(1) ("It is the intent of the Legislative Assembly that [PERS] be qualified and maintained under sections 401(a), 414(d) and 414(k) of the Internal Revenue Code as a tax-qualified defined benefit governmental plan."). The board, therefore, first determines the value of projected benefits for each member and then attempts to set current contribution rates so that, when invested, those contributions

will grow and fully fund the benefits that the member will receive in retirement. Member contribution rates are set by statute at 6% of the member's salary. ORS 238.200(1)(a); ORS 238A.330(1).[4] As a result, the board may adjust only the employer contribution rates.

The board sets employer contribution rates every biennium. *Strunk*, 338 Or at 159. Employer contribution rates can consist of two components: the "normal cost" and an amount needed to amortize any "unfunded actuarial liability." *Id.* at 160. An employer's normal cost is an "actuarial estimate" of its employees' future benefits attributable to that biennium. *Arken v. City of Portland*, 351 Or 113, 122, 263 P3d 975 (2011), *adh'd to on recons sub nom Robinson v. Public Employees Retirement Board*, 351 Or 404, 268 P3d 567 (2011). The normal cost, therefore, applies to only active members.

On the other hand, the unfunded actuarial liability can apply to all members, whether active, inactive, or retired. If the board determines that the previous normal costs that it collected will be insufficient to pay projected future benefits, then the amount of that insufficiency is the unfunded actuarial liability. *Strunk*, 338 Or at 160. When the plan is underfunded, the board increases employer contribution rates above the normal cost by adding an amount that will reduce the unfunded actuarial liability.[5] Rather than increase employer contribution rates to eliminate the unfunded actuarial liability in a given biennium, which could cause contribution rates to spike, the board typically seeks to pay down the unfunded actuarial liability over many years.

Unfunded actuarial liabilities result, in part, from uncertainties in the actuarial estimates used by the board. For example, those actuarial estimates include calculating

---

[4] Usually, employers pay for that contribution on behalf of their employees (called the "six percent pick up"). *See Strunk*, 338 Or at 164 n 21 (describing the six percent pick up); ORS 238.205(1) (authorizing employers to pick up the employee contribution); ORS 238A.335(1) (same).

[5] When the board determines that it previously overestimated the normal cost, then the employer receives a financial credit reducing its current normal cost. *Strunk*, 338 Or at 160.

and applying an assumed earnings rate on investments.[6] Unfunded actuarial liabilities may, therefore, result from the board's failure to achieve that rate of return. Historically, PERS has depended heavily on investment income. Between 1970 and 2012, more than 72% of the funding for PERS came from investment income.

The board faces further actuarial difficulties because of the nature of benefits available to each category of PERS member. An employee's membership category depends on when the employee worked for a participating employer. There are three broad categories of PERS members: Tier One members were hired before January 1, 1996; Tier Two members were hired between January 1, 1996, and August 28, 2003; and Oregon Public Service Retirement Plan (OPSRP) members were hired after August 28, 2003.[7]

Tier One and Tier Two members receive a monthly retirement benefit called a "service retirement allowance," which is paid for the life of the member. ORS 238.300. The service retirement allowance is funded by member and employer contributions. *Strunk*, 338 Or at 160. A member's contributions are deposited into a "regular account" and invested by the board. The board credits returns on those investments back into the member's regular account. The regular accounts of Tier One members are credited each year with an amount equal to at least the assumed earnings rate described above. Under certain conditions, the board may, but is not required to, allocate greater amounts to those accounts. *See id.* at 164-65 (describing crediting practices before and after the 2003 PERS legislation). The board uses the employee contributions and the amounts credited to the regular account to fund an annuity benefit that is paid for the life of the member. *Id.* at 165 n 22.

---

[6] For many years, the board applied an 8% assumed earnings rate. In 2013, the board lowered it to 7.75%.

[7] Although OPSRP has a different name and appears in a different ORS chapter, *see* ORS chapter 238 (setting out Tier One and Tier Two benefits) and ORS chapter 238A (setting out OPSRP benefits), all three categories are PERS members, *see* ORS 238.600(1) ("The Public Employees Retirement System consists of this chapter and ORS chapter 238A.").

Employer contributions, and their investment income, fund any unfunded part of the annuity owed to Tier One and Tier Two retired members, as well as an additional pension benefit for those members using one of three formulas: Full Formula; Money Match; or Pension Plus Annuity. *Id.* at 160-62.[8] The board uses whichever formula yields the highest pension amount for that member. ORS 238.300. This court previously detailed those formulas in *Strunk*. 338 Or at 160-62. For present purposes, it is important to note that the legislature intended the Full Formula, which is based on years of service and final average salary, to be the primary formula and the one most commonly used to determine a member's benefits. *Id.* at 185-86.

Those three pension formulas and the annuity are used to calculate the service retirement allowance at the time that a Tier One or Tier Two member retires. There are, however, two post-retirement calculations that may increase the benefit: a cost-of-living adjustment (COLA) and an income tax offset. *Id.* at 162. Both the COLA and the income tax offset are based on a percentage of the service retirement allowance and are funded through employer contributions. Because those benefits are central to this action, they are described in more detail below.

The value of those combined benefits—the service retirement allowance as adjusted by the COLA and the income tax offset—is what the board attempts to project when it sets employer contribution rates for Tier One and Tier Two members. To do that, the board makes actuarial projections involving a member's career path, future earnings, and life expectancy, as well as anticipated earnings on investments. Each of those projections involves uncertainty, making it difficult for the board to set proper contribution rates at any given time and creating the opportunity for unfunded actuarial liabilities.

The board's crediting practices during the 1980s and 1990s created further risks of unfunded actuarial liabilities. Although the legislature expected the Full Formula to be the primary formula, Money Match became

---

[8] Pension Plus Annuity is available to only those Tier One members who contributed to PERS before 1981. *Strunk*, 338 Or at 160.

predominant starting in the 1990s and continuing until 2012. Money Match calculates the member's pension based on the value of the member's regular account. When investment earnings significantly exceeded the assumed earnings rate during the 1990s and early 2000s, the board often credited much of those earnings to the Tier One members' regular accounts rather than saving more of those earnings in a reserve account used to pay the guaranteed return for Tier One members in underperforming years. *See id.* at 161 n 18 (describing how Money Match became the dominant formula). The Money Match formula, the board's crediting decisions, and the Tier One members' guaranteed rate of return combined to produce "atypical" retirement benefits exceeding those of public employees in other jurisdictions. Special Master's Report at 49.

That combination of factors not only led to larger benefits for members, but also exposed employers to larger liabilities. Further, because the reserve account was underfunded, the board had few options to address unfunded actuarial liabilities other than significantly increasing employer contributions. *See id.* at 48 ("The design and implementation of the Tier I Money Match program was an important, structural contributor to the system's financial challenges."). Despite requests by some public employers and media reports about the system's underfunding, the board did not change its crediting and other practices.[9] Moreover, until 2003, the legislature did not take action to limit PERS's obligations by prospectively reducing benefits.

By 2003, PERS was only 65% funded. At that time, the legislature responded by establishing the Individual Account Program (IAP) and creating the third tier of members, OPSRP. Other aspects of the 2003 legislation, as well as administrative changes to the calculation of benefits made by the board (after the board was reconstituted by the 2003 legislation), reduced the fund's obligations, thus helping to relieve some of the benefit liabilities.

---

[9] Participating employers ultimately challenged the board's crediting practices—specifically related to crediting orders in 1998 and 2000—and obtained court orders that led to the fund recouping some of those credits, as well as to other administrative changes. *See generally White*, 351 Or at 430-31 (describing the employer challenges).

Because of those legislative amendments, the contributions of Tier One and Tier Two members have, since 2004, no longer been placed into their regular accounts that fund the service retirement allowance. Instead, member contributions are placed into a separate IAP account that funds an IAP annuity. Although the IAP contributions are also invested, there is no guaranteed rate of return on those investments, even for Tier One members. *Strunk*, 338 Or at 164. Further, the IAP annuity is not paid for the life of the member, and it is not subject to a COLA. *Id.* The IAP annuity consists only of the money that exists in the member's IAP account at the time that the member retires. Because the member receives only his or her contributions and the investment income from those contributions, the IAP annuity can be viewed as a defined contribution component of the member's retirement benefit and presents no risk of unfunded actuarial liability.

The 2003 legislation creating the IAP had no retrospective effect on the contributions that Tier One and Tier Two members had already made to their regular accounts. Those previous contributions continue to fund service retirement allowance annuities, continue to be used to calculate service retirement allowance pensions, and, for Tier One members, continue to earn a guaranteed rate of return. *Id.* at 193. Further, the 2003 legislation had no impact on members who had already retired. They continue to receive the same benefits that were offered while they were working.

As a result of the 2003 legislation, Tier One and Tier Two members who have worked for a participating employer after 2003 receive two annuities—one under IAP and one as part of the service retirement allowance—and they continue to receive the service retirement allowance pension calculated under one of the three formulas noted above. The creation of the IAP has meant that the Full Formula is again the primary formula used to calculate service retirement allowances for Tier One and Tier Two members, although the percent of retirees qualifying for Money Match remains high. *See* Special Master's Report at 12-13 (stating that, as of January 2013, 45% of new retirees qualified for Money Match).

As noted, the 2003 legislation also created the third tier of PERS members: OPSRP members. Their retirement benefit is not called a service retirement allowance, although it also consists of an annuity and a pension. The annuity is the same IAP annuity available to Tier One and Tier Two members who continued to work after 2003. As a result, it is also a defined contribution component. The pension component is a less generous version of the Full Formula based on the member's years of service and final average salary. ORS 238A.125(1). The OPSRP pension includes a COLA, but the OPSRP annuity does not.

The 2003 reforms helped to stabilize PERS. Before the 2003 legislation, PERS's liabilities were growing by about 12% per year. After the 2003 legislation, PERS's liabilities grew by about 3 to 4% per year. Additionally, between 2003 and 2007, the fund's investments consistently earned well over the anticipated rate of return. After being only 65% funded in 2003, PERS was 98% funded by December 2007 and had about $1.5 billion in unfunded actuarial liability.[10] Consistently with its existing practice and policy, in early 2008, the board set the employer contribution rates for the 2009-2011 biennium, beginning July 1, 2009, based on that December 2007 valuation. For the 2009-2011 biennium, the board set employer contribution rates that resulted in a system-wide average employer contribution rate of 12.4%— that is, employers paid a combined weighted average of 12.4% of their payroll to PERS for the retirement benefits for its past and current employees.

C.  *Effect of the Recession*

In 2008, after the board set the contribution rates for 2009-2011, the investment market suffered historic

---

[10] The numbers used in this opinion, for both the funded status and the amount of unfunded actuarial liability, do not include "side accounts." Side accounts are generally lump-sum prepayments by an employer into the PERS trust using proceeds from pension obligation bonds. PERS does not calculate the employer's debt obligation from those bonds, and the record does not otherwise reflect those obligations. To the extent that an employer has paid down those debt obligations, the numbers used in this opinion might overstate total employer liabilities. But including side accounts, without including the debt obligations used to fund those accounts, would understate the total employer liabilities. Special Master's Report at 14-15.

losses. PERS's investments lost 27% of the fund's value in 2008. Those losses left the fund substantially underfunded. By December 2008, one year after determining that PERS was 98% funded, the board determined that PERS was only 71% funded and had about $16.1 billion in unfunded actuarial liability.

To balance those losses, the board was required to increase employer contribution rates. But, based on the schedule for setting and implementing employer contribution rates, the next rate increase would not go into effect until July 2011. And not all the losses would show up in that rate schedule, because the board uses a "rate collar," which spreads out large rate increases over multiple biennia. In 2010, the board set the rates for the 2011-2013 biennium. The "collared" system-wide average contribution rate set by the board for that biennium was 16.3%. Because that rate did not reflect all the 2008 losses, the unaccounted-for losses increased employer contribution rates in later biennia.

In 2012, the board set the employer contribution rates for the next biennium, 2013-2015, based on the December 2011 valuation. At that time, the fund's recent investment performance had been mixed, which left the funded status of PERS similar to what it had been in December 2008. Whereas PERS was 71% funded in December 2008 with $16.1 billion in unfunded actuarial liabilities, PERS was only 73% funded in December 2011 and maintained about $16.3 billion in unfunded actuarial liabilities. The 2013-2015 collared rate is 21.4%. Without the statutory amendments at issue in this case, the board projects that the rate will rise to about 25% and will remain at that rate through 2029.[11]

---

[11] From 1975 to 2005, average employer contribution rates were between 9.15% and 11.4%. After 2005, the rates rose because of the higher unfunded actuarial liabilities in the early 2000s and then were reduced as the board paid down those liabilities: 18.89% in 2005-2007; 14.9% in 2007-2009; 12.4% in 2009-2011. The record in this case, however, does not allow us to compare directly those historical employer contribution rates with the current and projected employer contribution rates. In 2013, the board adopted more conservative actuarial methods and assumptions that increase employer contribution rates by about 2.5%, at least in the short term. A comparison to historical contribution rates may not be useful anyway. Based on the current level of unfunded actuarial liabilities, it is apparent that those historical rates understated the actual costs that employers faced.

D.   *2013 Legislative Amendments*

The legislature responded to the effect of the recent recession on PERS with statutory amendments in 2013. Those amendments were intended to reduce employer contribution rates by reducing current and future benefits owed to PERS members, including, specifically, retired members. At that time, approximately 60% of the unfunded actuarial liability was owed to retired members. Those statutory amendments reflect two discrete categories of benefits: the COLA and the income tax offset.

1.   *COLA Statutes*

The COLA increases the benefits of retired members to account for changes in the cost of living. It applies to the entire service retirement allowance available to Tier One and Tier Two members, which includes both the annuity and pension components. And the COLA applies to the pension available to OPSRP members. But the COLA does not apply to the annuity available under the IAP for Tier One, Tier Two, or OPSRP members. The COLA has always been funded by employer contributions.

First enacted in 1971, the pre-amendment COLA statute had three notable components: the COLA requirement in subsection (1); the COLA cap in subsection (2); and the COLA bank in subsection (3).[12] *See* ORS 238.360 (2011);

---

[12] In full, the pre-amendment COLA provision that applied to Tier One and Tier Two members provided:

"(1) As soon as practicable after January 1 each year, the Public Employees Retirement Board shall determine the percentage increase or decrease in the cost-of-living for the previous calendar year, based on the Consumer Price Index (Portland area—all items) as published by the Bureau of Labor Statistics of the U.S. Department of Labor for the Portland, Oregon area. Prior to July 1 each year the allowance which the member or the member's beneficiary is receiving or is entitled to receive on August 1 for the month of July shall be multiplied by the percentage figure determined, and the allowance for the next 12 months beginning July 1 adjusted to the resultant amount.

"(2) Such increase or decrease shall not exceed two percent of any monthly retirement allowance in any year and no allowance shall be adjusted to an amount less than the amount to which the recipient would be entitled if no cost-of-living adjustment were authorized.

"(3) The amount of any cost-of-living increase or decrease in any year in excess of the maximum annual retirement allowance adjustment of two

ORS 238A.210 (2011); *see also* Or Laws 1971, ch 738, § 11 (enacting COLA).

The COLA requirement in subsection (1) required the board to calculate the COLA each year according to the Portland Consumer Price Index (CPI) and to add the COLA to the applicable retirement benefit—whether the service retirement allowance or the OPSRP pension benefit. According to that provision, the relevant retirement benefit "shall be multiplied by the [COLA]," and the benefit "adjusted to the resultant amount." ORS 238.360(1) (2011); ORS 238A.210(1) (2011). The COLA requirement made the COLA automatic and, by adding the COLA to the retirement benefit itself, allowed the COLA to compound from year to year. Therefore, as retired members aged, the COLA became a larger and larger percentage of their retirement benefit.

The COLA cap in subsection (2) originally limited the COLA to increasing or decreasing the retirement benefit by 1.5% in any year, provided that the adjusted benefit could not be less than the original benefit calculated at the time of retirement. *See former* ORS 237.060(1) (1971). In 1973, the legislature revised the cap to allow the COLA to increase or decrease the applicable retirement benefit by 2%. Or Laws 1973, ch 695, § 1. Before the 2013 amendments at issue in this case, the legislature had not changed the COLA cap since raising it in 1973.

The COLA "bank" referred to in subsection (3) kept reserves of changes to the CPI that were above or below the COLA cap. For example, if the CPI increased by 3% in one year, then the board applied a 2% COLA to a member's

---

percent shall be accumulated from year to year and included in the computation of increases or decreases in succeeding years.

"(4) Any increase in the allowance shall be paid from contributions of the public employer under ORS 238.225. Any decrease in the allowance shall be returned to the employer in the form of a credit against contributions of the employer under ORS 238.225."

ORS 238.360 (2011), *amended by* Or Laws 2013, ch 53, §§ 1, 3; Or Laws 2013 (Spec Sess), ch 2, §§ 1, 3. The COLA provision that applied to OPSRP members is substantively similar, except that it provides no COLA bank, as in subsection (3). ORS 238A.210 (2011), *amended by* Or Laws 2013, ch 53, §§ 5, 7; Or Laws 2013 (Spec Sess), ch 2, § 3.

benefit and banked the additional 1% increase so that it could be added to the member's COLA in later years when the CPI was less than 2%. Since 1972, the CPI has been below 2% in only seven years. As a result, most retired members have substantial percentage points in their COLA banks. The COLA bank was available to only Tier One and Tier Two members and was not available to OPSRP members.

During its regular legislative session in 2013, the legislature passed SB 822, which reduced the COLA cap from 2% to 1.5% for 2013 and then imposed a graduated COLA cap based on a member's total annual retirement benefit beginning in 2014.[13] SB 822, §§ 1-9. SB 822 reduced the COLA cap, but the COLA was still based on the Portland CPI and could still be banked. After passing SB 822, the legislature revisited the issue during a special session in September 2013. In that special session, the legislature passed SB 861, which made more dramatic changes to the COLA system beginning in 2014, replacing the graduated COLA cap of SB 822 before it went into effect. SB 861, §§ 1, 4. SB 861 converts the COLA benefit to a fixed COLA that is not based on the Portland CPI and is no longer subject to a COLA cap or COLA bank. The fixed annual COLA available under SB 861 is also graduated, although it is generally lower than the previous COLA caps, providing a 1.25% COLA on the first $60,000 of the retirement benefit and a 0.15% COLA on all benefits above $60,000.

To soften the impact of those changes, SB 861 also provides for supplemental payments for retired members to be paid from 2014 to 2019. Under SB 861, the board may provide retired members with an annual payment of 0.25% of their yearly retirement benefit, but not to exceed $150. Further, members receiving less than $20,000 per year in retirement benefits will receive a separate annual payment of 0.25% of their yearly retirement benefit, which can total up to $50. The supplemental payments, unlike the COLA,

---

[13] For 2014, SB 822 would have imposed a 2% COLA cap on the first $20,000 of the retirement benefit; a 1.5% COLA cap on the benefit between $20,001 and $40,000; a 1% COLA cap on the benefit between $40,001 to $60,000; and a 0.25% COLA cap on all benefits above $60,000. As discussed in the text, the legislature made further changes in the COLA during a 2013 special session before SB 822's 2014 rates went into effect.

are not added to the service retirement allowance or OPSRP pension, and they are not paid directly out of employer contributions. Instead, the supplemental payments are taken from the fund's contingency reserve. SB 861, § 8(6).

### 2. *Tax Offset Statutes*

In addition to the COLA amendments, the 2013 legislature also made changes to another post-employment PERS benefit: the income tax offset payment. Beginning in 1945, when the legislature first established PERS, all PERS retirement benefits were exempt from Oregon income tax. Oregon law provided no similar exemption for pension benefits of federal employees. In *Davis v. Michigan Dept. of Treasury*, 489 US 803, 109 S Ct 1500, 103 L Ed 2d 891 (1989), the United States Supreme Court held that exempting state pension benefits from taxation, but not exempting federal pension benefits, violated the intergovernmental tax immunity doctrine. *Id.* at 817. In *Davis*, the Court explained that a state could cure that violation either "by extending the tax exemption to retired federal employees (or to all retired employees), or by eliminating the exemption for retired state and local government employees." *Id.* at 818.

In response to *Davis*, the legislature eliminated the exemption for retired PERS members and began imposing personal income taxes on PERS benefits in 1991. Affected members sued. The next year, in *Hughes v. State of Oregon*, 314 Or 1, 838 P2d 1018 (1992), this court held that the tax exemption was part of the PERS contract and that the legislature had both impaired the PERS contract by eliminating the contractual obligation to exempt retirement benefits and breached the PERS contract by subjecting members' retirement benefits to state income tax. *Id.* at 31-33.

According to *Hughes*, the state could prevent members from accruing *additional* tax-exempt benefits, but the participating employers were contractually required to provide a tax exemption for retirement benefits that were earned while the tax exemption was in effect. *Id.* at 31 ("PERS retirement benefits accrued or accruing for work performed before the effective date of that section [repealing the tax exemption] \*\*\* may not be taxed."). As a result, the legislature could make *prospective* changes to the tax status

of pension benefits that members could earn going forward, but the legislature could not make *retrospective* changes—that is, could not deny tax benefits for future retirement payments that members had earned already. *Id.*

Rather than imposing a damage award against the employers for breaching the contract, *Hughes* allowed the legislature to determine in the first instance what an appropriate remedy would be. *Id.* at 33. Dissatisfied with the legislature's efforts to craft a remedy, affected members seeking damages brought a class action, known as the *Stovall/Chess* class action litigation. That action was resolved in 1997 through a settlement agreement that incorporated certain PERS changes that the legislature had enacted to offset the increased tax burden facing PERS members. Those changes were enacted as Oregon Laws 1991, ch 796 (SB 656) (1991 offset); Oregon Laws 1995, ch 569 (HB 3349) (1995 offset); and Oregon Laws 1997, ch 175 (HB 2034).[14]

The legislature enacted the 1991 offset at about the same time that it repealed the tax exemption. The 1991 offset provides a benefit to both active and retired members based on years of service, ranging from 1% for members with more than 10 years of service to 4% for members with more than 25 or 30 years of service, depending on the member's occupation. SB 656, § 4. Although the rate of the 1991 offset is not based on the income tax rate and was passed before this court's decision in *Hughes*, the legislature nevertheless intended the 1991 offset to avoid or mitigate the anticipated damage claim that was the subject of the *Hughes* decision. For that reason, the legislature included a provision that would allow employers to avoid paying the 1991 offset if "the retirement benefits payable under [PERS] are exempt from Oregon personal income taxation." SB 656, § 12(1).

The legislature enacted the 1995 offset in response to the *Stovall/Chess* litigation, which followed the *Hughes*

---

[14] The statutory scheme containing those laws has been renumbered and reorganized on numerous occasions since their original codification. The relevant provisions of SB 656 are currently compiled at ORS 238.366 and ORS 238.368. The relevant provisions of HB 3349 are currently compiled at ORS 238.362(3), (4)(a) and ORS 238.364. And the relevant provisions of HB 2034 are currently compiled at ORS 238.362(1), (2), (4)(b).

decision. *See* HB 3349, § 2(1) (noting that the benefits are "in compensation for damages suffered by those members * * * by reason of subjecting benefits paid * * * to Oregon personal income taxation"). To calculate the 1995 offset, the board applies a formula intended to negate the "maximum Oregon personal income tax rate," which was 9% in 1991. HB 3349, § 3(4)(a); *see* ORS 316.037(1)(a) (1991) (setting personal income tax rates). The 1995 offset applies to only the part of a member's benefit that "is attributable to service rendered by the member before October 1, 1991," which is when the legislature repealed the income tax exemption. HB 3349, § 3(4)(b); *see also [Vogl v. Dept. of Rev.](#)*, 327 Or 193, 206-08, 960 P2d 373 (1998) (describing the enactment of the 1995 offset). Further, both the 1991 and the 1995 offsets are available to only Tier One members who established membership in PERS before July 14, 1995. HB 3349, § 3(8). Members eligible for both the 1991 and 1995 offset payments receive only the higher of the two. HB 3349, § 3(1)(a).

The 1995 offset also includes two provisions relevant to the anticipated settlement of the *Stovall/Chess* litigation. First, no member may bring a new class action challenging the elimination of the tax exemption. HB 3349, § 4(a). And second, no member acquires a contractual right to the 1995 offsets. HB 3349, § 3 ("No member of the system or beneficiary of a member of the system shall acquire a right, contractual or otherwise, to the increased benefits provided by sections 3 to 10 of this Act."). In 1997, the legislature enacted a statute providing that, if the state decreases the benefits provided under the 1991 and the 1995 offsets without also decreasing the tax burden of PERS members, then a plaintiff member of the *Stovall/Chess* class action who had challenged the elimination of the tax exemption may reopen that class action. HB 2034, § 4(4)(b).

The settlement agreement that ultimately resolved the *Stovall/Chess* litigation in 1997 recognizes that the 1991 offset, the 1995 offset, and the 1997 amendments were enacted "to provide a remedy for state income taxation of PERS benefits" and that the plaintiff PERS members "agree[d] to accept the remedies provided in SB 656 (1991), HB 3349 (1995) and HB 2034 (1997) as full and

complete payment for all claims raised in these consolidated actions." The settlement agreement further states that, if the state reduces the benefits under those provisions without an equal reduction to the Oregon personal income taxes imposed on PERS members, then the class action may be reopened. *Id.*[15]

In 2011, the legislature amended the 1995 offset, so that it is no longer available to then-active and -inactive members who, upon retirement, live out of state or are otherwise not subject to Oregon personal income taxes. Or Laws 2011, ch 653, § 2. In 2013, the legislature passed SB 822, which, in addition to the changes to the COLA system discussed above, also amended the tax offset provisions. SB 822 prohibits paying either the 1991 offset or the 1995 offset to any retired member who is not subject to Oregon income tax assessments, including nonresident retirees. SB 822, §§ 11-13. That change affects more than 16,000 nonresident PERS retirees (or other beneficiaries), which is about 14% of benefit recipients.

E.   *Effect of the 2013 Amendments*

In March 2013, after SB 822 had been introduced, the board's actuary estimated the impact of the amendments contained in that bill—*viz.*, the first iteration of the COLA modifications and the elimination of the tax offset payments to nonresident PERS members. That analysis projected that SB 822 would reduce the employer contribution rates by 2.5% of total payroll. For the 2013-2015 biennium, it would reduce the employer contribution rates from 21.1% to 18.6%. And through 2029, the board projected that the pre-SB 822 rates would be 25.5% and the post-SB 822 rates would be 23.0%. Approximately 0.3% of the 2.5% reduction was attributable to the elimination of the tax offsets for nonresident retirees. The remaining 2.2% reduction was attributable to the COLA modifications.

---

[15] Additionally, the state faced lawsuits from federal retirees living in Oregon who had argued that the tax offsets were in fact tax rebates that violated *Davis* and the intergovernmental tax immunity doctrine. This court held that the 1991 offset did not violate the intergovernmental tax immunity doctrine but the 1995 offset did. *Ragsdale v. Dept. of Rev.*, 321 Or 216, 229, 895 P2d 1348 (1995), *cert den,* 516 US 1011, 116 S Ct 569, 133 L Ed 2d 493 (1995) (addressing the 1991 offset); *Vogel*, 327 Or at 211-12 (addressing the 1995 offset).

In September 2013, the board's actuary estimated the impact of the additional COLA modifications in SB 861, although the analysis did not include the supplemental payments that were ultimately included in SB 861. That analysis projected that SB 861 would reduce the projected employer contribution rates by an additional 2.0%. As a result, the combined effect of SB 822 and SB 861 is estimated to reduce employer contribution rates by 4.5% of total payroll through 2029, which represents about $5.3 billion in savings, stated on a system-wide, present value basis. Of those savings, about $390 million results from eliminating the tax offsets for nonresident retirees.

Those projected savings, combined with investment earnings that exceeded the assumed earnings rate (14.3% in 2012 and 15.6% in 2013), reduced PERS's unfunded actuarial liability. In December 2013, the board's actuary estimated that PERS's unfunded actuarial liability was $8.1 billion and that PERS was 87% funded.

## II.  ANALYSIS

Petitioners include both active and retired Tier One members, who are both residents of Oregon and nonresidents. They also include active Tier Two and OPSRP members, who are all residents. Petitioners contend that SB 822 and SB 861 unconstitutionally impair their employment contracts in violation of the state Contract Clause, Article I, section 21, of the Oregon Constitution, and the federal Contract Clause, Article I, section 10, clause 1, of the United States Constitution. In the alternative, they contend that the amendments breach their contracts and constitute an unconstitutional taking of their property without just compensation in violation of Article I, section 18, of the Oregon Constitution, and the Fifth Amendment to the United States Constitution. Petitioners further argue that the amendments violate the state Equal Privileges or Immunities Clause, Article I, section 20, of the Oregon Constitution, the federal Privileges and Immunities Clause, Article IV, section 2, clause 1, of the United States Constitution, and the federal Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Finally, one petitioner argues that the amendments violate a federal

statute, 4 USC section 114. Despite presenting those various challenges, petitioners generally focus their arguments on the state and federal Contract Clauses.

Respondents argue that the COLA and income tax offset are not contractual and, therefore, the changes to those statutes do not violate the state and federal Contract Clauses. Even if those provisions are part of a contract, respondents contend that the amendments do not substantially impair the contract and are justified by a sufficient public purpose.

When presented with arguments arising under both state and federal law, we generally attempt to dispose of the case on state law grounds before reaching questions of federal law. *Strunk*, 338 Or at 171. As a result, we begin with the state Contract Clause arguments.

A. *State Contract Clause*

The state Contract Clause, Article I, section 21, of the Oregon Constitution, states that "[n]o *** law impairing the obligation of contracts shall ever be passed[.]" Or Const, Art I, § 21. That provision was adopted in 1857 and derived from the federal Contract Clause, Article I, section 10, clause 1, of the United States Constitution. *See Eckles v. State of Oregon*, 306 Or 380, 389, 760 P2d 846 (1988) (tracing the history of the state Contract Clause). As a result, we have interpreted the state Contract Clause as being consistent with the United States Supreme Court's interpretation of the federal Contract Clause in 1857. *See id.* at 389-90 (inferring from the history of the state Contract Clause that "the framers of the Oregon Constitution intended to incorporate the substance of the federal provision, as it was then interpreted by the Supreme Court of the United States").

This court has previously recognized that, in 1857, it was well established that the federal Contract Clause protected only those obligations arising from contracts that were formed *before* the effective date of the law being challenged. *See id.* at 399 n 18 ("Future private contracts, as well, are not protected by the state and federal contracts clauses." (Citing *Ogden v. Saunders*, 25 US 213, 6 L Ed 606

(1827).)); *see also Local Div. 589, etc. v. Comm. of Mass.*, 666 F2d 618, 637 (1st Cir 1981) (Breyer, J.) ("It has been clear since 1827 that the [federal Contract] Clause applies only to laws with retrospective, not prospective, effect." (Citing *Ogden*, 25 US 213.)).

Federal courts have described that distinction as turning on whether the law in question operates prospectively or retrospectively. *See, e.g.*, *United States Trust Co. v. New Jersey*, 431 US 1, 18 n 15, 97 S Ct 1505, 52 L Ed 2d 92 (1977) ("[T]he States undoubtedly had the power to repeal the covenant prospectively."); *Local Div. 589, etc.*, 666 F2d at 637 (quoted above); *see also Robertson v. Kulongoski*, 359 F Supp 2d 1094, 1100 (D Or 2004), *aff'd,* 466 F3d 1114 (9th Cir 2006) ("The Contract Clause does not prohibit legislation that operates prospectively.").

The reason for that limitation is simple: If the contract creates obligations that contravene a law in effect at the time that the contract is entered, then the parties have no legitimate expectation that those obligations will be enforced. *See Eckles*, 306 Or at 399 n 18 ("[T]he laws in existence when a contract is formed define the obligation of the contract."); *see also [Bagley v. Mt. Bachelor, Inc.](#)*, 356 Or 543, 552-53, 340 P3d 27 (2014) ("[C]ourts determine whether a contract is illegal by determining whether it violates public policy as expressed in relevant constitutional and statutory provisions and in case law[.]" (Citing *Delaney v. Taco Time Int'l, Inc.,* 297 Or 10, 681 P2d 114 (1984).)).

We have applied that limitation expressly. For example, in *Eckles*, we held that a provision of the Transfer Act, which shifted funds from a state trust account to the state's general fund, violated the state Contract Clause only "insofar as it affects *** insurance contracts entered into before the enactment of the Transfer Act." *Eckles*, 306 Or at 399. Nevertheless, that same provision was valid "[a]s to subsequent contracts, including renewals of [existing] contracts[.]" *Id.* As to those contracts entered after the law's effective date, the law "would define, not impair, the [parties'] contractual obligations[.]" *Id.*

Similarly, in *Hughes*, we relied on *Eckles* and prohibited repealing the PERS tax exemption "as it relates to

PERS retirement benefits accrued or accruing for work performed before the effective date of that [repeal]." 314 Or at 31; *see also id.* at 20 ("Accrued and accruing pension benefits are protected under Oregon Law."). As we quoted approvingly from an Attorney General Opinion, "'Employe[e] pension plans, whether established by law or contract, create a contractually based vested property interest which may not be terminated by the employer, *except prospectively.*'" *Id.* at 20-21 (quoting 38 Op Atty Gen 1356, 1365 (1977) (emphasis in original)).

Therefore, when applying the state Contract Clause, we consider the potential impairment of contractual obligations arising only from contracts *entered into before* the effective date of the law being challenged. In this case, SB 822 became effective on May 6, 2013, and SB 861 became effective on October 8, 2013. The scope of our analysis is defined by the obligations arising from contracts entered before those dates.

Our analysis in previous cases addressing violations of the state Contract Clause has focused on the following questions: (1) is there a contract?; (2) if so, what are its terms?; (3) what obligations do those terms require?; and (4) has the state impaired an obligation of that contract? *Strunk*, 338 Or at 170 (citing *Hughes*, 314 Or at 14).

We normally answer those questions by applying general rules of contract law. *Id.* But if the state is alleged to be a party to the contract, we supplement the general rules of contract law with additional considerations informed by the state's role serving the public. *Id.* On the one hand, enforcing state contracts binds the state to its previous promises, which were made to advance its previous policy goals. Requiring the state to meet those obligations can prevent or hinder the state's pursuit of its current policy goals by limiting funds available to pursue those goals. On the other hand, the state would be unable to pursue its current policy goals if it were unable to bind itself at all—that is, if it were unable to make any enforceable promises to other parties. The state, for example, would have a hard time finding a company to build its roads if the state were unable to enter into an enforceable contract with

a construction company, ensuring that the company would get paid for its work. Providing parties with binding contractual rights facilitates mutually beneficial exchanges, which in turn benefit the state as much as any other party to a contract.

Thus, the state may enter into contracts and be bound by the promises contained in those contracts, so long as the state is not "contract[ing] away its 'police powers'" or limiting its power of eminent domain. *Id.* at 14. Further, we have long applied a canon of construction that disfavors interpreting statutes as contractual promises. *See Strunk*, 338 Or at 171 (disfavoring statutory contracts binding the state).[16] When the legislature pursues a particular policy by passing legislation, it does not usually intend to prevent future legislatures from changing course. *Id.* For that reason, "'[t]he intention to surrender or suspend legislative control over matters vitally affecting the public welfare cannot be established by mere implication.'" *Id.* at 171 (quoting *Campbell et al. v. Aldrich et al.*, 159 Or 208, 213-14, 79 P2d 257 (1938)). We therefore treat a statute as a contractual promise only if the legislature has "'clearly and unmistakably'" expressed its intent to create a contract. *Id.* (quoting *Campbell*, 159 Or at 213-14); *see Hughes*, 314 Or at 14 ("[A] state contract will not be inferred from legislation that does not unambiguously express an intention to create a contract."). With those considerations in mind, we turn to the questions posed above.

    1.   *Is there a contract?*

We have repeatedly held that the legislature "intended and understood" that PERS benefits are contractual and, as a result, "PERS is a contract between [a participating employer] and its employees." *Hughes*, 314 Or at 18; *see also Strunk*, 338 Or at 183 (noting the contractual

---

[16] We have previously noted that those limitations may not be exhaustive, "but any further rules of this nature 'must be found within the language or history of Article I, section 21, itself.'" *Hughes*, 314 Or at 14 (quoting *Eckles*, 306 Or at 399). Federal courts recognize similar limitations and refer to them as the "reserved powers doctrine" and the "unmistakability doctrine." *United States v. Winstar Corp.*, 518 US 839, 874, 116 S Ct 2432, 135 L Ed 2d 964 (1996) (opinion of Souter, J.).

nature of PERS benefits).[17] The parties agree that each of the petitioners in this case has a contract with a participating employer relating to PERS benefits. Because of their agreement on that point, the parties provide little analysis of that question in the briefing. But the nature and scope of that contract provide necessary context for the answers to the other questions posed by this challenge and therefore deserve further discussion.

A contract is most commonly formed by an offer, an acceptance of that offer, and an exchange of consideration. *See Homestyle Direct, LLC v. DHS*, 354 Or 253, 262, 311 P3d 487 (2013) (describing contract formation; citing *Restatement (Second) of Contracts* § 17(1) (1981)).[18] Ordinarily, an offer contains a promise that will become enforceable only when the offer is accepted. *See Restatement* § 24 comment a ("In the normal case, * * * the offer itself is a promise[.]"); Richard A. Lord, 1 *Williston on Contracts* § 4:7, 449 (4th ed 2007) (defining an ordinary offer as a "conditional promise").

In the employment context, an employer frequently offers a promise of compensation in exchange for an employee's service. The compensation can take various forms, such as salary, bonuses, and fringe benefits. Pension benefits are another form of compensation. Whereas, for example, salary is compensation paid to the employee every two weeks or at the end of each month, a pension is compensation paid to the employee at retirement. Pension benefits therefore are "part of the employee's promised but delayed compensation for the performance of his [or her] job." *Taylor v. Mult. Dep. Sher. Ret. Bd.*, 265 Or 445, 450, 510 P2d 339 (1973). Regardless of whether the pension benefit is promised by a public or private employer, "the employee accepts a lower present wage in order to receive a pension upon retirement[.]" Lord, 19 *Williston on Contracts* § 54:38 at 541.

---

[17] The modification of the quote from *Hughes* substitutes "a participating employer" for "the state." The court in *Hughes* used "the state" as a "convenient term[] for all public employers." *Hughes*, 314 Or at 5 n 3.

[18] "Consideration" is that which one party provides to the other in exchange for entering into the contract. *See Homestyle Direct*, 354 Or at 262 (describing consideration); *see also Restatement* § 71(2) (defining "consideration" as a performance or return promise "sought by the promisor in exchange for his promise and [] given by the promisee in exchange for that promise").

As a result, the contracts at issue in this case are the employment contracts between petitioners and their participating public employers. To the extent that each employment contract binds a participating employer to fund PERS benefits for its employees, we previously have referred to those contractual obligations as the "PERS contract." *See, e.g.*, *Hughes*, 314 Or at 6 n 5 (stating that the "'PERS contract'" refers to "the contracts [that PERS members] each have with their respective PERS participating employers").

Although the PERS contract results from an offer and acceptance, the PERS statutes are themselves not an offer that employees can accept. Instead, each participating employer offers a promise to its employees to provide compensation, including PERS benefits, in exchange for the employees' services. *See Stovall v. State of Oregon*, 324 Or 92, 123, 922 P2d 646 (1996) ("[The] employers were the entities that agreed to the terms of [the employees'] compensation, including the terms relating to retirement benefits."). The PERS statutes establish that PERS benefits are a statutorily required term in the offer that each participating employer makes to its employees. *See id.* at 124 ("[P]articipating PERS employers *** promised plaintiffs that plaintiffs would receive, at a minimum, the retirement compensation provided in the PERS statutes."); *see also Restatement* § 5 comment c (describing statutory contract terms).

Before a participating employer's promise of PERS benefits becomes the PERS contract for any particular employee, it is merely an offer that the employee can either accept or reject. Generally, an offer, by itself, does not impose any obligation on the offering party, who may change or revoke an offer that has not been accepted—assuming that the offering party is not otherwise required to leave the offer open. *See Hogan v. Alum. Lock Shingle Corp.*, 214 Or 218, 226, 329 P2d 271 (1958) ("[T]here is no agreement until the offer has been accepted in accordance with its very terms."); *see also Restatement* § 24 comment a (noting that an offer is "revocable until accepted"); Arthur Linton Corbin, 1 *Corbin on Contracts* § 2.19 at 222 (Joseph M. Perillo ed., rev ed 1993) ("Any communicated change in the terms of an offer operates as a revocation of that offer."). But once an offer

has been accepted, it ceases to be an offer as such; instead, the terms of the offer become the terms of the contract. *See Restatement* § 42 comment c ("Once the offeree has exercised his power to create a contract by accepting the offer, a purported revocation is ineffective as such.").

Therefore, a participating employer's offer of PERS benefits becomes a contract only when an employee accepts the offer. An offer can invite two different types of acceptance, resulting in either a bilateral contract or a unilateral contract. An offer for a bilateral contract invites the other party to accept with a return promise—that is, by *promising* some future performance. *See* 1 *Corbin on Contracts* § 1.23 (describing bilateral contracts). An offer for a unilateral contract invites the other party to accept with performance—that is, by actually *doing* the performance that the offering party seeks. *See id.* (describing unilateral contracts). As a result, by the time that an offer for a unilateral contract is accepted, the accepting party has already fully performed and owes the offering party no future obligation. *Id.* In that case, the resulting contract is unilateral because only the offering party owes a legally enforceable obligation to the other. *Id.*; *see also Homestyle Direct*, 354 Or at 268-69 (describing unilateral contracts); Mark Pettit, Jr., *Modern Unilateral Contracts*, 63 B U L Rev 551, 552 (1983) ("The distinguishing feature of the unilateral contract is that the second party (the offeree) has not made a promise in return.").

Because the offer of PERS benefits invites employees to accept by providing current service for the employer—rather than by promising to provide some service in the future—the resulting PERS contract is a unilateral contract. *See Hughes*, 314 Or at 21 ("'[A]doption of the pension plan was an offer for a unilateral contract.'" (Quoting *Taylor*, 265 Or at 452.)). In this case, petitioners have accepted the offer by providing the services that their employers sought. *See Stovall*, 324 Or at 124 (1996) ("Plaintiffs accepted [the promised PERS benefits] by working for their employers."); *Hughes*, 314 Or at 21 n 26 ("'[A]n employee pension or disability plan may be viewed as an offer to the employee which may be accepted by the employee's continued employment, and such employment constitutes the underlying consideration

for the promise.'" (Quoting *Rose City Transit Co. v. City of Portland*, 271 Or 588, 593, 533 P2d 339 (1975).)).

Thus, an employee earns a contractual right to the offered PERS benefits at the time that the employee renders his or her services to the employer.[19] But merely because the PERS contract has been formed does not mean that the contractual relationship between the employer and the PERS member becomes static. As long as the employer continues offering PERS benefits, PERS members can continue accepting that offer and, thereby, earn additional contractual rights to additional PERS benefits.

Those concepts are difficult to apply to pension benefits, because of the complex formulas often used to calculate the benefits and because of the lapse of time between the employee earning the benefit and the employer delivering the benefit. Those concepts are seen more clearly when applied to a simpler benefit, such as salary. For example, in *State ex rel. Thomas v. Hoss*, 143 Or 41, 21 P2d 234 (1933), an employee was working for the Bureau of Labor and earning a salary of $180 per month. *Id.* at 42-43. In the middle of March 1933, the legislature reduced his salary to $172 per month. *Id.* at 47. When the state issued his monthly paycheck at the end of March, the state applied the lower salary to the entire month. *Id.* at 42-43.

This court rejected the state's contention that the law required that the employee receive the lower salary for the whole month, even though he had worked for half the month while the state was offering the higher salary. *Id.* at 47.

---

[19] In previous decisions, this court has described the formation of the PERS contract as conveying to the accepting employee a "vested" right to the offered retirement benefits. *See, e.g.*, *Oregon State Police Officers' Assn. v. State of Oregon*, 323 Or 356, 380, 918 P2d 765 (1996) (*OSPOA*) (so stating); *Hughes*, 314 Or at 20 (same). However, in the pension context, "vested" has a specific meaning that is distinct from contract formation and from benefit accrual. "Accruing" is "the rate at which an employee earns benefits to put in [the employee's] pension account[.]" *Central Laborers' Pension Fund v. Heinz*, 541 US 739, 749, 124 S Ct 2230, 159 L Ed 2d 46 (2004). "Vesting" is "the process by which an employee's already-accrued pension account becomes irrevocably [the employee's] property[.]" *Id.* Therefore, an employee who has rendered service to a participating public employer has accepted the employer's offer and accrued PERS benefits even before the employee has a vested right to the benefits. An unvested PERS member has only a limited contractual right to the accrued benefits, because the employer's obligation to provide those benefits is conditional on the employee having a vested right to the benefits.

According to the court, "the legislature was at liberty at any time to reduce [the salary] amount. But it is settled that *after a salary has been earned* the public employee's right thereto becomes vested and cannot be taken away by any legislation thereafter enacted[.]" *Id.* (emphasis added). The employee, therefore, accepted the salary being offered at the time that he rendered his services. Although he could be paid the lower salary for the second part of the month— because he continued working even after the state reduced its salary offer—the employee was entitled to the higher salary for the first part of the month, because he had been offered the higher salary during that part of the month and he had accepted that offer by working during that period.[20]

In effect, the court in *Thomas* treated the employer's salary offer as a continuing offer that remained open for a series of acceptances and resulted in a series of separate contracts. *See* Corbin, 1 *Corbin on Contracts* § 2.33 at 300 ("[A]n offer [can be] made in such terms as to create a power to make a series of separate contracts by a series of separate acceptances."). The employee, therefore, first accepted that continuing offer on his first day of work. That acceptance established his contractual right to the offered compensation only for that day's work. The employee repeatedly accepted that offer each subsequent day that he worked for the employer, establishing his additional contractual right to compensation for each additional day's work. But as to future work that the employee had not yet performed, the employee had not accepted the employer's continuing offer, which remained just that—an offer. *See id.* ("The closing of one of these separate contracts by one acceptance leaves the offer still revocable as to any subsequent acceptance."). In those circumstances, unless an employer is subject to a legal obligation to keep that offer open, the employer can,

---

[20] The United States Supreme Court reached the same result more than 80 years earlier in *Butler et al. v. Pennsylvania*, 51 US 402, 13 L Ed 472 (1850). There, the Court found no violation of the federal Contract Clause when the Pennsylvania legislature reduced the salary of certain employees who had been appointed to positions with a fixed term at a fixed salary. *Id.* at 409. The Court held that, although the legislature could change the salary going forward, "[t]he promised compensation for services actually performed and accepted, during the continuance of the particular agency, may undoubtedly be claimed, both upon principles of compact and of equity[.]" *Id.* at 416.

like other offering parties, change or revoke the unaccepted offer of compensation for future work.

Similarly, the PERS offer is a continuing offer. An employee's acceptance of the offer does not preclude the employee from accepting the offer further by rendering additional services. Each additional rendition of service accepts any open offer for additional PERS benefits. The PERS contract reaches only as far as a member has accepted the offer, and a member's acceptance reaches only as far as the work that the member has performed.

That analysis reveals how and when the PERS contract is formed and the scope of the PERS benefits owed: The PERS contract binds a participating employer to compensate a member for only the work that the member has rendered and based on only the terms offered at the time that the work was rendered, even if the employer changed that offer over time. *Cf.* Corbin, 1 *Corbin on Contracts* § 3.16 at 387 ("The employee accepts the offer by merely continuing to render the specified service, and becomes entitled to the promised salary in proportion to the work actually done.").

That analysis, however, does not necessarily require a finding that the PERS offer can be changed prospectively, like the salary offer in *Thomas*. The parties in this case dispute whether, before the 2013 amendments, one of the express or implied terms offered and accepted included a promise that the participating employers would not change the terms of the offer, even prospectively. *See Restatement* § 87 (describing conditions under which an offering party has a legal obligation to leave an offer open). We resolve that issue below. *See* 357 Or at 221-26.

For present purposes, it is sufficient to conclude that, under the prospective/retrospective distinction that we apply under the state Contract Clause, our analysis is limited to the potential impairment of obligations owed by the participating employers, and earned by members through the work they performed, before the effective dates of the amendments at issue. That analysis includes considering whether, before the effective date of the amendments, participating employers were contractually obligated to keep relevant parts of the PERS offer open even after the effective

date of the amendments. We begin that analysis by determining the relevant terms of that PERS contract.

2.   *What are the terms of the contract?*

Petitioners contend that the pre-amendment tax offset statutes and the pre-amendment COLA statutes are contractually enforceable terms of the PERS contract. According to petitioners, the unmistakability doctrine—which, as noted, requires courts to interpret statutes as noncontractual unless the legislature's intent to bind the state is unmistakable—applies to only the previous question of whether there is a contract, but does not apply to determining the terms of a contract. Petitioners further argue that the pre-amendment version of both the income tax offset statutes and the COLA statutes reveal the legislature's promissory intent through their use of the term "shall." Respondents dispute petitioners' arguments and contend that the unmistakability doctrine applies to this question and that the statutes at issue fail to furnish the clear and unmistakable legislative intent to offer the income tax offsets and the COLA as terms of the PERS contract.

a.   Standards for identifying terms of the contract

To resolve this dispute, we first address the standard of legislative intent applied to this step. Respondents are correct: the standard of clear and unmistakable contractual intent applies to both the question of whether there is an offer to form a contract and also to whether a particular provision is a term of that offer. Our case law plainly requires that result. *See, e.g.*, *Arken*, 351 Or at 136 ("[T]he terms of the statutory PERS contract are a matter of legislative intent and only statutory terms that 'unambiguously evince[] an underlying promissory, contractual legislative intent' become a part of the statutory PERS contract." (Quoting *Hughes*, 314 Or at 26.)).

Although respondents correctly identify the standard articulated in our case law, respondents ask us to apply that standard by setting a much higher bar than we have applied in the past. According to respondents, the legislature can satisfy that standard only by expressly describing the statutory benefit as a contract, promise, or guarantee.

Contrary to respondents' assertions, however, our cases discussing and applying that standard do not focus solely on the use of such specifically promissory language.[21] Instead, we have repeatedly emphasized the importance of context at this step—namely, the context of *already* having established that the parties intended to form a contract. *See, e.g.*, *Strunk*, 338 Or at 183 ("[W]e are mindful that the 'accepted proposition of the contractual nature of PERS is an essential background' for our inquiry." (Quoting *Hughes*, 314 Or at 22.)). Because we *already* have found that the legislature intended PERS benefits to be part of the employer's contractual promise of compensation, the standard of clear and unmistakable intent now focuses only on whether the legislature intended a particular PERS provision to be part of that promise.

As we have held in prior cases, the PERS statutory scheme may define the terms of the PERS contract, even though it does not use language referring directly to contracts, promises, or guarantees. *See, e.g.*, *Strunk*, 338 Or at 186 (finding that a member's right to the use of a particular service retirement allowance formula is "unambiguously promissory"); *Hughes*, 314 Or at 26 (stating that the PERS previous tax exemption provision "unambiguously evinces an underlying promissory, contractual legislative intent").[22]

---

[21] Although it is common for courts to treat statutory public pension programs as contractual, it is "quite rare" for pension statutes to expressly refer to contractual rights. Amy B. Monahan, *Public Pension Plan Reform: The Legal Framework*, 5 Education, Finance & Policy, Minnesota Legal Studies Research, No 10-13, 5 n 6 (2010) ("It is possible for a statute to contain explicit language regarding the creation of a contractual relationship (*see, e.g.*, N.J. Stat. Ann. § 43:13-22.33 (2009)), but this is quite rare.").

[22] The importance of context is well established in our case law. In *Hughes*, for example, we criticized attempts to view a provision "in isolation and evaluate whether [the provision], standing alone, demonstrates the requisite unambiguous legislative intent to create a contractual obligation." 314 Or at 23. Ignoring the provision's context "is not analytically proper or helpful." *Id.* at 25. The court in *Hughes* also reviewed numerous federal cases considering federal Contract Clause challenges and concluded, "The constitutional protection that was afforded to those provisions' obligations followed from the fact that they were part of a larger contract, not that they were promissory in and of themselves." *Id.* at 21 n 27. The court held that the same principles applied to identifying the terms of the PERS contract. *See id.* ("This case presents an analogous situation where we are faced with an underlying contract—the PERS contract—and the question is whether the tax exemption statute is a term of that contract.").

Still, not every provision within the PERS statutory scheme is a term in the PERS contract. *See Oregon State Police Officers' Assn. v. State of Oregon*, 323 Or 356, 405, 918 P2d 765 (1996) (OSPOA) (Gillette, J., specially concurring in part and dissenting in part) ("[N]ot *every* statutory provision in [PERS] is a part of that contract. Instead, whether a particular provision is part of that contract is a question of legislative intent." (Emphasis in original.)). Beyond noting that doubtful cases should be resolved in favor of finding that a provision is not a term of the contract being offered, there are two principles that we have considered in prior cases that guide our use of context here.[23]

First, because the PERS offer promises remunerative pension benefits as compensation for employment, the offer may include provisions that define the eligibility for benefits or the scope of benefits. *See, e.g., Hughes*, 314 Or at 22-23 (assessing whether a provision was an "integral part of the PERS statutes" and whether it was "part and parcel" with the state's promise of pension benefits); *id.* at 26 (considering the "purpose of the PERS contract"); *Eckles*, 306 Or at 393 (considering that the purpose of a disputed provision was to provide assurances "to induce skeptical employers to participate in a state insurance system"). Because the legislature intended PERS to be part of an offer promising pension benefits to employees, statutes defining eligibility for, or the scope of, those benefits may be part of the PERS offer, unless the legislature expresses a contrary intent.

That principle is based in part on the potential distinction between provisions that relate to a remunerative aspect of PERS and those that relate to an administrative aspect of PERS. *See Strunk*, 338 Or at 239 (Balmer, J., concurring) (noting that a "patently administrative provision" should not be treated as contractual because the legislature failed to provide clear and unmistakable contractual intent, even though the change may affect actual benefits received by some members). The PERS statutes address both the

---

[23] We do not mean to suggest that there may not be other principles to consider in other cases, including other PERS cases. Rather, we mean only that we identified these two principles as relevant in prior PERS cases.

participating employers' promise of pension benefits and the manner in which the legislature directs the board and the employers to carry out that promise, and the PERS offer does not necessarily include those administrative aspects of PERS as compensation for employment.

Second, not all remunerative provisions are terms of the PERS offer. Instead, a remunerative provision will be a term of the offer only if it is mandatory, rather than optional or discretionary. *See, e.g.*, *Strunk*, 338 Or at 201 ("Notably absent is any directive that, following such application, [the board] *must* apply any remaining earnings to PERS members' regular accounts." (Emphasis in original.)); *Hughes*, 314 Or at 26 (finding that the tax exemption provision was a term of the offer after emphasizing that the tax exemption provision "provided that the PERS retirement benefits 'shall be' exempt from all state and local taxes").

>    b.   Were the pre-amendment tax offset provisions
>         a term of the PERS contract?

Retired nonresident petitioners contend that the 1991 and 1995 offsets are terms of the PERS contract.[24] As described above, the bills creating those provisions have a complicated history, which is reflected in the complex statutory scheme codifying those benefits.

Nevertheless, determining whether the 1995 offset is contractual is simple. The statute itself states expressly that it is not contractual: "No member of the system or beneficiary of a member of the system shall acquire a right, contractual or otherwise, to the increased benefits provided by sections 3 to 10 of this 1995 Act." HB 3348, § 2(3). Thus, the legislature clearly intended that the 1995 offset would not be contractual.

Petitioners contend that the legislative history establishes that the 1995 Legislative Assembly expected that that provision, HB 3348, § 2(3), codified as ORS 238.362(3), would be repealed by a future legislature if the parties settled their then-pending litigation over the income

_____

[24] The nonresident *Moro* petitioners contend only that the 1991 offset is contractual.

tax exemption. And petitioners point out that the parties entered a settlement agreement in 1997.

Even if we were to credit petitioners' reading of the legislative history, we would nevertheless interpret and enforce the 1995 offset as it is written. Under petitioners' interpretation, the 1995 Legislative Assembly left to future legislatures the decision of whether to repeal HB 3348, § 2(3). Regardless of whether the 1995 Legislative Assembly expected that a future legislature would repeal that provision, the legislature has not, in fact, repealed it. *See Strunk*, 338 Or at 178 (rejecting a similar interpretation of HB 3348, § 2(3)).

The 1991 offset requires a different analysis. The 1991 offset includes mandatory wording without the same expressly noncontractual wording as the 1995 offset. *See, e.g.*, SB 656, § 3(6) (stating that service retirement allowances "shall be increased" according to the 1991 offset). Nevertheless, the context and legislative history of the 1991 offset establish that the 1991 offset is not part of the PERS contract because it is not a component of the type of employment compensation benefits otherwise found in the PERS contract.

To be sure, the 1991 offset was intended to compensate PERS members for the losses that they would incur when the state repealed the income tax exemption. *See Ragsdale*, 321 Or at 224 (so stating). But the statute itself was not an offer that members had accepted by rendering services nor was it initially supported by an exchange of consideration. Instead, the legislature enacted the 1991 offset as a type of pre-emptive damage payment to mitigate a claim for breach of the PERS contract that no court had yet sustained.

The legislature tied the 1991 offset to the repeal of the tax exemption—rather than tying it to the work that members performed—by preventing the payment of the 1991 offset in any year in which the tax exemption was effective. SB 656, § 12(1)-(2). Further, the legislature considered the 1991 offset at the same time that it considered repealing the tax exemption. And prior to repealing the

tax exemption, legislative leaders sought advice from the Attorney General on, among other things, whether the state could mitigate damages arising from that breach by enacting offsetting benefits. Letter of Advice dated May 10, 1989, to Sen Kitzhaber and Rep Katz (OP-6320); *see also Hughes*, 314 Or at 19 n 22 ("Where a legislative enactment follows the legal advice given, before the enactment, in an opinion of the Attorney General, we have relied on such an opinion as providing an indication of the legislature's purpose in enacting the measure."). The Attorney General advised that the state could mitigate damages "by increasing PERS benefits to offset PERS members' increased tax liability caused by the breach." Letter of Advice dated May 10, 1989, to Sen Kitzhaber and Rep Katz (OP-6320). During hearings on the 1991 offset, Senate President Kitzhaber noted that the legislature was "trying to develop a strategy that offsets the impact of the tax." Minutes of Senate Committee on Labor, SB 656, SB 735, SB 1035, SB 1106, SB 138, SB 1041, SB 632, May 8, 1991 (testimony of Sen John Kitzhaber).

Thus, although the 1991 offset is calculated according to years of service, it was intended to compensate PERS members for a breach of contract and not for their years of service. The 1991 offset was, therefore, not an offer to PERS members inviting them to render services. It was, instead, a noncontractual payment from participating employers to PERS members, intended to limit the amount of the employers' liability if a breach of contract were later established.

Even after this court held in *Hughes* that imposing Oregon personal income tax on PERS benefits breached the PERS contract, the participating employers were not under a contractual obligation to pay the 1991 offset until the 1991 offset was incorporated into the 1997 settlement agreement. Until then, the legislature remained free to change the statute and discontinue the mitigation payments that the employers had made previously. Ending those mitigation payments would have increased the ultimate damage award needed to remedy the breach, but ending those mitigation payments would not have given rise to a separate breach of

contract claim. As a result, we hold that the 1991 offset is not a term of the statutory PERS contract.[25]

Petitioners further argue that, if the 1991 offset and the 1995 offset are not terms of the statutory PERS contract, they are nevertheless terms of the 1997 settlement agreement that resolved the *Stovall/Chess* class action litigation. Petitioners correctly state that the settlement agreement incorporates the income tax offset statutes: "Plaintiffs agree to accept the remedies provided in SB 656 (1991), HB 3349 (1995) and HB 2034 (1997) as full and complete payment for all claims raised in these consolidated actions." The settlement agreement is a contract through which the class action plaintiffs waived their claim for the damages they incurred as a result of the tax-exemption repeal and, in return, the participating employers promised to provide the benefits set out in the 1991 and 1995 tax offsets.

Although the settlement agreement is a contract, petitioners cannot assert that the legislature's 2013 changes to the tax offsets impair their rights under that contract. The settlement agreement itself contemplates future legislative action decreasing the benefits available under the tax offsets. According to the settlement agreement, if the legislature decreased the benefits available under the tax offsets, then the legislature could avoid disturbing the parties' rights under the settlement agreement by enacting "an equivalent decrease in the Oregon personal income tax imposed on PERS benefits attributable to service rendered before" the repeal of the tax exemption. And if the legislature failed to similarly decrease Oregon tax liabilities, then the class action plaintiffs would be allowed to reopen the class action litigation and seek supplemental relief.

---

[25] Petitioners attempt to refute that conclusion by citing repeatedly from this court's opinion in *Ragsdale*, which considered whether the 1991 offset violated the intergovernmental tax immunity doctrine. 321 Or at 229. In the context of considering whether the 1991 offset was a tax rebate, this court stated that, under the 1991 offset, "every state retiree who qualifies for benefits (based on years of service) will receive the benefits, regardless of the state retiree's residency." *Id.* at 230. Suffice it to say that *Ragsdale* addressed a different legal issue. Even if *Ragsdale* correctly identifies who qualified for the 1991 offset, *Ragsdale* sheds no light on whether the legislature intended to create a statutory contract when it enacted the offset provisions.

Petitioners contend that SB 822's amendments to the tax offsets have not been balanced out by equivalent decreases in state taxes. Even if true, that would not establish an impairment of the settlement agreement. Rather, it would establish the contractual right to reopen the class action litigation. We have not been asked to consider, nor do we have jurisdiction to consider, the scope of that contractual right or its availability to nonresident class members. Therefore, we do not resolve any potential argument that the right to reopen the class action litigation does not extend to nonresident petitioners because, under both state and federal law, the Oregon personal income tax has been completely eliminated as to nonresident PERS retirees since 1996. *See* 4 USC § 114(a) (preventing a state from "impos[ing] an income tax on any retirement income of an individual who is not a resident or domiciliary of such [s]tate"); ORS 316.127(9)(a) ("Retirement income received by a nonresident does not constitute income derived from sources within this state unless the individual is domiciled in this state.").[26]

Based on the foregoing, we hold that the 1991 and 1995 offsets are not terms of the statutory PERS contract and, therefore, are not obligations under that contract that could be "impaired" for purposes of applying the Contract Clause. The 1991 and 1995 offsets, however, are terms of the 1997 class action settlement agreement. But the amendments contained in SB 822, which reduce the benefits provided to nonresident retirees under that settlement agreement, neither impair nor breach the terms of that agreement, because the agreement expressly contemplates, and provides a means for seeking relief for, such benefit reductions.

c. Was the pre-amendment COLA provision a term of the PERS contract?

As explained above, for Tier One and Tier Two members, the pre-amendment COLA consisted of three relevant

---

[26] Oregon's personal income tax applies to the taxable income of "every full-time nonresident that is derived from sources within this state." ORS 316.037(3). Both 4 USC section 114 and ORS 316.127(9) apply to retirement income received after December 31, 1995. State Taxation of Pension Income Act of 1995, Pub. L. No. 104–95 (HR 394), 109 Stat 979 (effective as to income derived on or after January 1, 1996); Or Laws 1997, ch 839, § 11 (same).

subsections: the COLA requirement in subsection (1); the COLA cap in subsection (2); and the COLA bank in subsection (3). ORS 238.360 (2011). OPSRP members were subject to substantially the same COLA provision, except that they did not have a COLA bank available. ORS 238A.210 (2011).

Petitioners contend that this court has already decided that the pre-amendment COLA provision is contractual. In *Strunk*, this court considered a state Contract Clause challenge involving the same pre-amendment COLA provisions at issue here. 338 Or at 213. The legislative amendment in *Strunk* temporarily prevented the board from making COLA adjustments to the service retirement allowances of certain retirees. *Id.* This court assessed the merits of that challenge by first determining whether the same pre-amendment COLA provision at issue in this case "constituted a term of the PERS statutory contract[.]" *Id.* at 220. We first considered the text and context of the COLA provision to determine whether it was a term of the PERS contract. The text of the pre-amendment COLA statutes is the same in this case as in *Strunk*, and the court in *Strunk* emphasized the numerous phrases indicating that the adjustment was mandatory:

> "'(1)  As soon as practicable after January 1 each year, [*the board*] *shall determine the percentage increase or decrease in the cost of living for the previous calendar year*, based on the Consumer Price Index \*\*\*. Prior to July 1 each year *the allowance which the member or the member's beneficiary is receiving or is entitled to receive* on August 1 for the month of July *shall be multiplied by the percentage figure determined, and the allowance for the next 12 months beginning July 1 adjusted to the resultant amount.*'

> "'(2)  Such increase or decrease shall not exceed two percent of any monthly retirement allowance in any year and no allowance shall be adjusted to an amount less than the amount to which the recipient would be entitled if no cost of living adjustment were authorized.'"

*Id.* at 220-21 (quoting ORS 238.360 (2001)) (emphases in original; bracketed material added). This court then analogized the COLA provision to the tax exemption provision in *Hughes*: "Like the tax provision analyzed in *Hughes*, the text

of ORS 238.360(1) (2001) evinces a clear legislative intent to provide retired members with annual COLAs on their service retirement allowances, whenever the CPI warrants such COLAs." *Id.* at 221. Based on that analysis, this court held that "the general promise embodied in ORS 238.360(1) (2001) was part of the statutory PERS contract[.]" *Id.* Petitioners claim that *Strunk* establishes a precedent that the pre-amendment COLA provision is contractual and ask us to adhere to that precedent.

Respondents disagree. As an initial matter, respondents read *Strunk* narrowly as holding that only the COLA requirement in subsection (1) is a term of the contract. Based on that premise, respondents argue that the COLA cap and COLA bank were not addressed in *Strunk* and therefore this court should consider whether they are terms of the PERS contract without relying on *Strunk*.

Respondents' narrow reading of *Strunk* fails, because it does not account for the incongruity that would result from treating the COLA requirement in subsection (1) as contractual but treating the COLA cap and the COLA bank as noncontractual. For example, the COLA requirement in subsection (1) ties the COLA to the CPI without limitation. If the CPI went up 7%, then under subsection (1) each retiree would receive a 7% COLA. If that limitless COLA requirement were really the only contractual aspect of the COLA provision, then the COLA cap would actually *breach* the PERS contract by limiting the COLA. That is not the result that respondents seek.

It is also not what the legislature intended. In the original COLA statutes passed in 1971 and 1973, the COLA requirement expressly referred to and incorporated the COLA cap.[27] *See former* Or Laws 1971, ch 738, § 11; Or Laws

---

[27] Under *former* ORS 237.060 (1971), the relevant subsections were set out in reverse order. The COLA cap was contained in subsection (1), and the COLA requirement was in subsection (2). *Former* ORS 237.060(1)-(2) (1971). At that time, the COLA requirement incorporated the COLA cap by stating, "Prior to July 1 each year the allowance which the member is receiving or is entitled to receive on August 1 for the month of July shall be multiplied by the percentage figure determined, and *subject to subsection (1) of this section*, the member's allowance for the next 12 months beginning July 1 adjusted to the resultant amount." *Former* ORS 237.060(2) (1971) (emphasis added).

1973, ch 695, § 1. In 1989, through an amendment that was not intended to impact the substance of the COLA provision, the legislature removed that cross-reference but moved the COLA cap into another subsection. *See* Or Laws 1989, ch 799, § 2 (re-organizing the COLA provision and moving the COLA cap); *see also Strunk*, 338 Or at 221 (noting that the "substance" of the COLA requirement and COLA cap has "remained unchanged, notwithstanding other interim amendments"). The legislature, therefore, intended that the COLA requirement would operate together with the COLA cap. Further, because the COLA bank merely directs the board on how to apply the COLA cap, the COLA bank must be interpreted consistently with the COLA cap.

Respondents nevertheless argue that, because the COLA cap restricts the amount of COLA that employees can receive, it was intended to benefit *employers* and is therefore distinct from any employee benefit that might otherwise be created by the COLA requirement. But that argument improperly frames the question.[28] As noted, a provision is most often a term of the PERS contract if the provision determines the eligibility for, or scope of, a mandatory PERS benefit. Regardless of whether the COLA cap benefits employers or employees, the COLA cap clearly determines the scope of the COLA requirement, and the COLA requirement was intended to benefit employees.

We conclude, therefore, that the legislature intended the COLA requirement to be read with both the COLA cap and the COLA bank as determining the overall value of the COLA benefit. If the COLA requirement is contractual, as we held in *Strunk*, then the COLA cap and COLA bank are also contractual. We therefore read *Strunk* as providing precedential authority for treating the COLA requirement, the COLA cap, and the COLA bank of ORS 238.360 (2011) as terms of the PERS offer.

---

[28] Further, it is improper to assume that the COLA cap benefits only employers. Whether a particular COLA cap benefits employers or employees depends on the alternatives. Employers may benefit from a COLA cap of plus or minus 2% if the alternative is a limitless COLA. But at the time the legislature passed the COLA cap of plus or minus 2%, the alternative was the existing COLA cap of plus or minus 1.5%. Or Laws 1973, ch 695, § 1. The legislative history indicates that increasing the COLA cap to plus or minus 2% was intended to benefit employees.

Given that precedent, respondents ask us to disavow our analysis of the COLA provision in *Strunk*. As the parties seeking disavowal, respondents must "affirmatively persuad[e] us that we should abandon that precedent." *Farmers Ins. Co. v. Mowry*, 350 Or 686, 692, 261 P3d 1 (2011). Departing from precedent may be justified "when a party affirmatively demonstrates that 'an earlier case was inadequately considered or wrong when it was decided.'" *Id.* at 693. However, departing from prior precedent comes at the cost of "predictability, fairness, and efficiency." *Id.* As a result, "[w]e will not depart from established precedent simply because the 'personal policy preference[s]' of the members of the court may differ from those of our predecessors who decided the earlier case." *Id.* at 698.

Respondents contend that this court in *Strunk* inadequately considered the issue of whether the pre-amendment COLA provision was part of the PERS contract. We disagree. Although the analysis in *Strunk* is brief, it demonstrates sufficient consideration of the issue. In *Strunk*, we largely relied on the similarities between the pre-amendment COLA provision and the tax exemption provision at issue in *Hughes*. *Strunk*, 338 Or at 221. Both provisions set out financial benefits, and both use mandatory wording. *Hughes*, 314 Or at 26 (noting that the tax exemption statute stated that PERS benefits "'shall be'" exempt from income taxes (quoting ORS 237.201 (1989))); ORS 238.360(1) (2001) (stating that the board "shall" calculate the COLA and that the COLA "shall be" added to the service retirement allowance). *Strunk* does not contain more analysis of that issue, but *Hughes* contains an extensive analysis of why those factors are salient. *Hughes*, 314 Or at 22-27. The court's heavy reliance on *Hughes* in *Strunk* does not mean that the court failed to adequately consider the issue.

Respondents further argue that the legislative history of the COLA provision demonstrates that *Strunk* was wrong at the time that it was decided. When the state began offering PERS pension benefits in 1945, that offer included no mechanism for automatically adjusting the benefits for inflation. Or Laws 1945, ch 401. The service retirement allowance calculated at the time of retirement was to remain

unchanged. Thus, as time went on, inflation diminished the purchasing power of the service retirement allowance.

In 1963, the legislature attempted to offset those losses by authorizing the board to distribute money to retirees from investment returns earned in excess of the assumed interest rate. Or Laws 1963, ch 608, § 9. The statute described that plan as a "dividend payment system." *Id*. The board was not, however, required to make any payments under that system. Instead, the board had discretion whether to do so. *Id*. ("The board * * * *may* distribute * * * net interest received through investment of the fund in excess of the assumed rate of interest." (Emphasis added.)). The system was not only discretionary, but it was also conditioned on the fund's investments generating returns in excess of the assumed earnings rate. *Id*. Further, any payments that the board made under that system were one-time payments that did not affect the retiree's service retirement allowance going forward. *Id*.

That system was in effect from 1964 to 1971. During that time, the board authorized one payment per year to retirees, in addition to the 12 monthly checks that retirees received for their retirement allowance. Those additional checks issued under the dividend repayment program were known as "thirteenth checks." *See* Special Master's Report at 22-23 (describing the history of the dividend repayment program). In 1964, retirees received a thirteenth check equal to one month of the retiree's retirement allowance. *Id*. The checks grew and, by 1971, were equal to 3.5 times the retiree's monthly retirement allowance. *Id*. at 24. Those checks, however, did not increase a retiree's service retirement allowance and thus did not have the effect of "compounding" that the later COLA provision had.

In 1971, the legislature repealed the discretionary dividend payment system and enacted the COLA system currently at issue. Or Laws 1971, ch 738, §§ 8, 11. As noted above, the 1971 COLA provision imposed a COLA cap of plus or minus 1.5%. Or Laws 1971, ch 738, § 11(1). The 1973 legislature increased the COLA cap to plus or minus 2%. Or Laws 1973, ch 695, § 1. Other than that increase in

the COLA cap, the COLA system enacted in 1971 is substantively the same as the pre-amendment COLA provision in effect until the 2013 amendments at issue in this case. Despite enacting the COLA statute, the legislature still provided discretionary *ad hoc* adjustments to service retirement allowances from time to time, to help protect the purchasing power of the retirement allowances.

Respondents contend that that legislative history establishes that the COLA system is not a term of the PERS contract. According to respondents, the original dividend payment system was not a term of the contract for two reasons. First, the benefits were discretionary rather than mandatory. Second, the benefits were gratuitous, because they were new benefits granted to individuals who were already retired and who thus could not have accepted an offer for new benefits by working. Respondents then argue that the legislature intended the COLA system to be simply a continuation of the discretionary and gratuitous dividend payment system.

The conclusions that respondents draw from the legislative history do not withstand scrutiny. Respondents are correct that the original dividend system was discretionary and gratuitous, but they are incorrect that the COLA system is simply a continuation of the earlier scheme. The COLA system is materially distinct from the dividend payment system. First, in contrast to the discretionary dividend payment system, the COLA system is mandatory. Under the pre-amendment COLA system, the board was required to determine the percentage increase or decrease in the cost of living for the previous year based on the CPI and required to adjust service retirement allowances accordingly. ORS 238.360(1) (2011) (so stating). By enacting the COLA system, the legislature made the board's function ministerial and the application of the COLA automatic.

Second, the fact that the pre-amendment COLA system required employers to fund new benefits for some individuals who were already retired does not mean that the COLA benefit was not part of the employers' offer to current or future employees who could accept the offer by working. Instead, it means only that the employers' offer of

COLA benefits was not accepted by the individuals who had already retired and, therefore, that those retirees did not have a *contractual* right to the COLA. There is no doubt that one of the goals of the COLA statute was to benefit then-current retirees. But that goal is not inconsistent with the goal of also providing greater financial benefits (and an incentive to begin or continue employment) to individuals who had not yet retired and who could accept a pension offer that included COLA benefits.

Further, despite enacting the COLA system in 1971, the legislature continued to make additional discretionary *ad hoc* payments during periods of particularly high inflation. As a result, employees could reasonably expect that the COLA statute codified some minimum automatic protection of the purchasing power of their future benefits that was separate from any discretionary and gratuitous *ad hoc* benefits that the legislature might otherwise provide.

Other material distinctions support our conclusion that the COLA benefits were not merely a continuation of the discretionary dividend payment benefits. For example, whereas the dividend payments were supplemental payments that had no effect on how the board calculated the service retirement allowance, the COLA is not a supplemental payment and instead directly adjusts the service retirement allowance itself. ORS 238.360(1) (2011) ("Prior to July 1 each year the allowance which the member or the member's beneficiary is receiving or is entitled to receive on August 1 for the month of July shall be multiplied by the percentage figure determined, and the allowance for the next 12 months beginning July adjusted to the resultant amount."). Therefore, the board, as directed by statute, incorporates the COLA into the formula used for determining each retiree's service retirement allowance, and, after multiplying by the appropriate interest rate, the "resultant amount" *is* the "allowance."

Additionally, the legislature funded the COLA increases through current employer contributions rather than rely on investment returns that exceed the assumed interest rate in given year, which had been used to fund the dividend payments. ORS 238.360(4) (2011) (COLA increases

paid by employer). Those employer contributions are actuarially determined in an effort to prefund an employee's service retirement allowance before the employee retires. *See Strunk*, 338 Or at 160 (stating that employer contribution rates are based in part on "the PERS actuary's best estimate of the amount needed to pay service retirement allowances to current members in the future"). The COLA, as noted above, is part of the service retirement allowance employees will receive during their retirement. In fact, the COLA is one of the actuarial assumptions that the board uses to project the service retirement allowance of current employees and determine the employer contribution rates. *See, e.g.*, *Oregon Public Employees Retirement System Actuarial Valuation* 65 (Dec 13, 2013) (listing the statutory "Cost-of-Living Adjustments" as an actuarial assumption); *see also id.* at 21, 39 (noting that employer contributions are based on actuarial assumptions). As a result, unlike the dividend payment program, employers pay for benefits under the COLA system in exactly the same manner as the other components of the service retirement allowance.

We therefore reject respondents' reading of the legislative history of the COLA provisions and conclude that nothing to which we have been directed by respondents undermines our prior conclusion in *Strunk* that the COLA is a term of the PERS offer.[29]

Finally, respondents argue that, even if *Strunk* controls and this court applies that decision here, *Strunk* reaches only Tier One and Tier Two members, under ORS 238.360 (2011), and should not be extended to OPSRP members, under ORS 238A.210 (2011). Respondents are correct that *Strunk* does not address OPSRP members directly. In arguing that OPSRP members are distinct from Tier One and Tier Two members, respondents do not rely on differences in the COLA statutes applicable to each category of

---

[29] That conclusion is consistent with federal law holding that a COLA is a term of a pension contract protected under ERISA. *See, e.g.*, *Hickey v. Chicago Truck Drivers Union*, 980 F2d 465, 469 (7th Cir 1992) ("A participant's right to have his basic benefit adjusted for changes in the cost-of-living accrued each year along with the right to the basic benefit. A participant's entitlement to his or her normal retirement benefit included, as one component, the right to have the benefits adjusted pursuant to the COLA provision.").

members. As noted above, the COLA statute applicable to OPSRP members is substantially similar to the COLA statute applicable to Tier One and Tier Two members, except that OPSRP members do not have access to the COLA bank. *Compare* ORS 238.360 (2011) (providing COLA benefits to Tier One and Tier Two members) *with* ORS 238A.210 (2011) (providing COLA benefits to OPSRP members). Instead, respondents rely on a reservation of rights provision, ORS 238A.470, that the legislature applied to OPSRP members but not to Tier One and Tier Two members. That provision states:

> "The Legislative Assembly may change the benefits payable to [OPSRP members] \*\*\*, as long as the change applies only to benefits attributable to service performed and salary earned on or after the date the change is made."

ORS 238A.470.

We have not had occasion to interpret ORS 238A.470. Respondents interpret the provision as setting up a distinction between prospective and retrospective changes to benefits. According to respondents, the reservation of rights allows the legislature to make only prospective changes to benefits that are "attributable to service performance and salary earned," ORS 238A.470, and therefore limits the legislature's ability to make retrospective changes to those benefits. Respondents further contend that that limitation does not apply to benefits that are not "attributable to service performance and salary earned," *id.*, and that the legislature is free to make any changes to such benefits, even retrospective changes. Respondents then argue that COLA benefits for OPSRP members are attributable to the CPI and are not attributable to service performed or salary earned. Under that reading, the legislature reserved the right to make any change, without limitation, to the OPSRP COLA benefit. A consequence of that reasoning is that any promise contained in the pre-amendment COLA provision would be illusory, and therefore not contractual, because the legislature retained the discretion to retrospectively eliminate the benefit.

Respondents' argument does not fit the wording of the reservation of rights provision set out in ORS 238A.470. In the context of that provision, the phrase "as

long as" means "provided that," *Webster's Third New Int'l Dictionary* 129 (unabridged ed 2002), and serves the same function as the phrase "if and only if," Rodney Huddleston and Geoffrey K. Pullum, *The Cambridge Grammar of the English Language* 758 (2002). As a result, the legislature reserved the right to change benefits if and only if the change applies to benefits "attributable to service performed and salary earned on or after the date the change is made." ORS 238A.470. If COLA benefits are not "attributable to service performed and salary earned," as respondents contend, then ORS 238A.470 would not authorize the legislature to make any changes to the COLA benefit, whether prospective or retrospective.

Regardless, COLA benefits *are* "attributable to service performed," and therefore, under the only plausible reading of ORS 238A.470, they may be changed only prospectively. A benefit is attributable to service performed if the employee acquires a right to that benefit as a result of service performed. In that sense, the benefit is payable to the OPSRP member because of the service that the member performed. Respondents' position confuses the rate of the benefit and the right to receive the benefit. The rate of the benefit is set by the combination of the CPI and the COLA cap, but the employee's right to receive the benefit is a result of the service performed.

As a result, we conclude that the pre-amendment COLA provisions are terms of the PERS contract for each category of PERS members, whether Tier One, Tier Two, or OPSRP.

   3.   *What obligations do those terms provide?*

Because the 1991 and 1995 offsets are not part of the PERS contract or otherwise capable of legislative impairment, we do not need to consider those provisions further. But the pre-amendment COLA statutes are part of the PERS contract. As a result, we turn now to identifying the participating employers' obligations under the PERS contract. "It is those obligations that set the conditions that the legislature may not in the future alter without consequence." *Strunk*, 338 Or at 201.

As discussed above, the state Contract Clause prohibits laws impairing obligations that arise from contracts formed before the law's effective date. PERS members accept their employers' offers of PERS benefits by rendering services to their employers. Like the employee in *Thomas* who repeatedly accepted his employer's continuing offer of salary each day that he worked, PERS members repeatedly accept their employers' PERS offers by continuing to work and thereby earn additional contractual rights to PERS benefits for that additional work. For example, if an employer offers, and continues offering, two PERS members the same compensation package, including PERS benefits, then—assuming all other things are equal—the employee who works longer will have a contractual right to a larger retirement benefit under PERS.

This court relied on *Thomas*, and applied the same analysis, to assess the PERS tax exemption provision in *Hughes*. 314 Or at 29 n 33 (citing *Thomas*, 143 Or 41). Because all PERS offers before October 1991 included a tax exemption benefit, employees who had rendered services before October 1991 had accepted that offer and had accrued a contractual right to tax-exempt PERS benefits. *Id.* at 29. That acceptance, however, protected only the part of the service retirement allowance that was earned before the exemption was repealed in October 1991. *Id.* Therefore, in *Hughes*, by the time that the legislature repealed the PERS tax exemption, PERS members already had a contractual right to their accrued service retirement allowance that would not be subject to state income taxes, even though the employees had not yet retired and did not yet know the value of their service retirement allowance.

Similarly, in this case, by the time that the legislature enacted SB 822 and SB 861, modifying the pre-amendment COLA provisions, PERS members already had a contractual right to their accrued retirement benefits that would be subject to the pre-amendment COLA. *Hughes*, therefore, establishes a contractual obligation applicable in this case: Members are entitled to have the pre-amendment COLA applied to accrued PERS benefits earned before the COLA amendments went into effect.

The remaining question is whether the participating employers' obligations extend beyond that baseline, *viz.*, whether the participating employers were prohibited from revoking the offer of the pre-amendment COLA benefits. If the employers are required to continue offering the pre-amendment benefits, then members might be allowed to accept that offer on a continuing basis by performance until they retire and to accrue additional retirement benefits subject to the pre-amendment COLA.

Our case law has not consistently answered that remaining question.[30] As noted, *Hughes* allowed the employers to revoke the offer of tax-exempt PERS benefits for future work after finding no legislative intent to make the offer irrevocable. *Hughes*, 314 Or at 28 ("The statute does not, however, refer to PERS retirement benefits that may accrue in the future. Had it chosen to do so, the legislature could have dealt with future benefits, but it did not."). Although the PERS members had accrued a right to receive, at retirement, a tax-exempt service retirement allowance for the years that they had worked before the tax exemption was repealed, the right that they accrued did not require the employers to continue *offering* tax-exempt service retirement allowances. For that reason, participating employers could change, and thus revoke, the *offer* of tax-exempt PERS benefits. *Id.* at 29 ("[T]he state promised that all PERS retirement benefits that have accrued or are accruing for work performed so long as *former* ORS 237.201 remained in effect * * * are exempt from state and local taxation forever. * * * [But the] state has no contractual obligation not to tax unaccrued PERS retirement benefits for work performed after the effective date of the Act[.]"). Revoking the offer of tax-exempt PERS benefits, however, precluded only the accrual of *additional* tax-exempt service retirement allowances. Employees who accepted the PERS offer before the repeal and who additionally accepted the PERS offer after the appeal would therefore receive a

---

[30] Other courts similarly have struggled with this issue. *See McGrath v. Rhode Island Retirement Bd., etc.*, 88 F3d 12, 17 (1st Cir 1996) (collecting cases and stating that "[t]hough the principle that a pension plan represents an implied-in-fact unilateral contract is fairly well settled and has been applied repeatedly to state and municipal pension plans, there is significant disagreement about when contractually enforceable rights accrue under such plans" (internal citations and footnote omitted)).

service retirement allowance that was only partially exempt from state taxes.

We applied a similar analysis in *Strunk*, which upheld PERS amendments that affected the rate at which retirement benefits would accrue for only future work. *See, e.g.*, 338 Or at 193 (rejecting "claims that the redirection of PERS members' *future contributions* to the IAP, as set out in the 2003 PERS legislation, either breaches or impairs a contractual obligation of the PERS contract" (emphasis added)); *id.* at 213 (affirming amendments to "discontinue permitting PERS members to contribute to their variable accounts"). The court in *Strunk* recognized that an offer for a particular PERS benefit could be irrevocable only if the irrevocability is an express term of the offer. *See id.* at 192 n 40 ("The predicate question—which we determine to be dispositive in these cases—is whether *the contract offer* that the particular pension plan presents *contains* such a promise, *i.e.,* a promise that extends over the life of a covered member's service." (First emphasis added; second emphasis in original.)); *see also Restatement* § 25 ("An option contract is a promise which meets the requirements for the formation of a contract and limits the promisor's power to revoke an offer."); *Restatement* § 87(1)(a) ("An offer is binding as an option contract if it *** is made irrevocable by statute."). The court in *Strunk* found no such words.

This court, nevertheless, reached the opposite conclusion in *OSPOA*, 323 Or 356, which was decided after *Hughes* but before *Strunk*. The court in *OSPOA* concluded that an offer for pension benefits is irrevocable not because the irrevocability was an express term of the offer, but because the irrevocability was an implied term of the offer. According to *OSPOA*, a right to pension benefits, including PERS benefits, "vest[s] on acceptance of employment[,] *** with vesting encompassing not only work performed *but also work that has not yet begun.*" *Id.* at 371 (emphasis added). In reaching that conclusion, the court in *OSPOA* relied extensively on *Taylor*, in which this court had found an offer for pension benefits to be impliedly irrevocable as to an employee who attempted to participate in the pension plan. *See id.* at 368 ("'The adoption of the pension plan was an offer for a unilateral contract. Such an offer can be

accepted by the tender of part performance. \*\*\* [P]lain-tiff's tender of [part performance] terminated defendants' power to revoke the offer[.]'" (Quoting *Taylor*, 265 Or 445, 452-53.)).

*Taylor*, however, is distinguishable from both *OSPOA* and this case. *Taylor* addressed the vesting of pension benefits that had already accrued. In *Taylor*, a corrections officer was eligible to participate in her employer's pension plan, which required employees to work for 20 years before vesting. 265 Or at 450.[31] The employee tendered her salary contributions after her first year of eligibility, but her employer refused to receive them and then amended the pension ordinance to exclude corrections officers from the plan. *Id.* This court recognized the potential problem when an offer for a unilateral contract proposes an acceptance that takes time to complete. When the performance necessary to accept the offer takes time to complete, there is a concern that the offering party will revoke the offer after receiving partial performance but before receiving the complete performance necessary to form the unilateral contract.[32]

To address that concern, this court held in *Taylor* that, because of the time that it would take the employee to vest the benefits that she should have accrued, the offer contained an implied term that prevented the employer from revoking the employee's opportunity to vest those benefits. *Id.* at 452. That holding is consistent with rules of general contract law that an offer is impliedly irrevocable if the invited form of acceptance takes time to complete and the accepting party is attempting to complete the acceptance. *See Restatement* § 45 (describing the formation of an implied option contract). That type of implied irrevocability might apply, for example, if it takes an employee a year to satisfy the conditions necessary for a retention bonus. *See, e.g.*, *Walker v. American Optical*

---

[31] *See also* Multnomah Cnty., Or, Ordinance No. 25 (July 10, 1969) (describing eligibility for pension) (provided in Respondent's Answering Brief at 9, *Taylor v. Mult. Dep. Sher. Ret. Bd.*, 11 Or App 488, 502 P2d 601 (1972)).

[32] *See* Lord, 1 *Williston on Contracts* § 5:13 at 987 ("As a theoretical matter, when an offeror makes an offer to enter into a unilateral contract, he or she should be free to withdraw the offer at any time until performance has been completed by the offeree. However, great injustice may arise if the offeror's power of revocation continues so long.").

*Corp.*, 265 Or 327, 330-31, 509 P2d 439 (1973) (assessing the formation of a retention bonus contract).

None of the claims in *OSPOA*, however, involved conditions that took time to complete, such as the vesting requirement in *Taylor*. *OSPOA*, nevertheless, relied on *Taylor* and treated all pension offers as irrevocable, reasoning that participating employers "promised a pension benefit that plaintiffs could realize only on retirement with sufficient years of service, that is, *after* rendering labor for the state. Plaintiffs accepted that offer by working." *OSPOA*, 323 Or at 374 (emphasis in original). But *OSPOA*'s analysis establishes only that PERS is an offer for a unilateral contract. As discussed above, a unilateral contract is always formed only *after* the accepting party has completed the performance sought by the offering party. The fact that PERS is a unilateral contract simply means that the employee is not contractually bound to carry out some future performance—that is, there is nothing in the terms of the PERS contract obligating the employee to continue working for the employer.[33] But the implied term of irrevocability recognized in *Taylor* does not apply to all offers of unilateral contracts; instead, it applies to only those offers that are accepted by performance that takes time to complete. *Taylor*, 265 Or at 452-53.[34]

Unlike the vesting requirement at issue in *Taylor*, the COLA benefit at issue in this case does not impose conditions on acceptance that take time to complete. As discussed above, the COLA benefit accrues incrementally as a PERS member renders additional service to his or her employer.

---

[33] Other terms of the employment agreement certainly could obligate the employee to continue working for a specified period. But no such term is required by the PERS contract. And this case does not present facts that would allow us to consider how the statutory irrevocability of the COLA benefits would apply to an employment contract that sets an employee's rate of compensation for a specified period of time, often called a "term contract."

[34] Most employment relationships, including at-will employment relationships, are governed by such unilateral contracts. *See, e.g.*, Lord, 19 *Williston on Contracts* § 54:8 at 368 ("In fact, it has been said that most employment contracts are unilateral, and this seems clearly to be the case with an at-will employment relationship." (Footnote omitted.)); Pettit, 63 B U L Rev at 559-60 ("Cases arising from the employer-employee relationship now comprise the largest and most important group of cases in which courts invoke the concept of the unilateral contract.").

The member's work continually and serially completes the performance necessary to accrue the benefits attributable to that work, thus eliminating the concern of uncompensated work that drove this court's analysis in *Taylor*.

In *Strunk*, this court attempted to distance itself from *OSPOA* by limiting *OSPOA* to the specific statutes at issue in that case. *See Strunk*, 338 Or at 191-92 ("[N]othing about the court's interpretation of the statutory provisions at issue in *OSPOA* mandates a conclusion different from the one that we have reached after analyzing the text and context of ORS 238.300 (2001)."). But the decision in *OSPOA* did not rely on the wording of the specific statutes at issue in that case. Instead, *OSPOA* prohibited prospective amendments based on a particular view of pension plans that is not supported by *Taylor* and is inconsistent with our earlier decision in *Hughes*, with our later decision in *Strunk*, and with the analysis set out above. As a result, we go a step further than we did in *Strunk* and disavow the reasoning that we applied in *OSPOA*.[35]

Even under the reasoning of *Hughes* and *Strunk*, participating employers may nevertheless be required to continue to offer the pre-amendment COLA benefit if the irrevocability is an express term of the contractual rights that the employees accrued before the effective dates of SB 822 and SB 861. Petitioners contend that the employers are obligated to continue offering the pre-amendment COLA benefits to all employees who began to work when those benefits were in effect. In support of that position, they point to numerous places where the pre-amendment COLA provisions use mandatory language, such as "shall." *See, e.g.*, ORS 238.360(1) (2011) (directing that the member's retirement service allowance "shall be multiplied by the percentage figure determined, and the allowance for the next 12 months beginning July 1 adjusted to the resultant amount").

The legislature's use of "shall," without more, is plainly insufficient to establish the irrevocability of an offer. Although this court has considered the use of "shall" as a

---

[35] Our holding disavows only the reasoning applied by this court in *OSPOA*. Our holding does not reach, and we have not been asked to consider, the precedential value of *OSPOA* as it relates to the specific benefits at issue in that case.

factor that can weigh in favor of finding a statutory contract offer, *see, e.g.*, *Hughes*, 314 Or at 23 (applying statute providing that PERS benefits "shall be exempt" from Oregon income tax (quoting *former* ORS 237.201 (1989)), the use of "shall," without more, has not been used to establish irrevocability, *see, e.g.*, *id.* at 29 (allowing participating employers to prospectively revoke their offer of tax-free PERS benefits). Consider, for instance, an employer's promise that it "shall" pay a potential employee $3,000 per month. That promise does not expressly provide that the employer will not change the employee's compensation in the future, nor can we imply from the word "shall" a promise to maintain that salary without change.

The insufficiency of that argument is reinforced by the concerns that we set out at the beginning of our Contract Clause analysis—namely, that legislatures generally do not intend to bind future legislatures. An irrevocable statutory offer—particularly one that could involve potentially decades of new and significant financial liabilities—would deviate widely from that general presumption.

We therefore reject petitioners' claim that the COLA is an irrevocable term of the PERS offer that cannot be changed prospectively. We agree with respondents that the COLA provisions do not include a promise to apply any specific COLA to increase retirement benefits for work that is yet to be performed.

4.  *Has the state impaired an obligation of the contract?*

As we have just discussed, participating employers are contractually obligated to provide members with the pre-amendment COLA benefits for benefits earned before the amendments became effective. Although the participating employers can change the COLA offer as to benefits that might accrue in the future, they cannot change the COLA contract as to benefits that have already accrued.

SB 822 reduced the COLA cap from plus or minus 2% to plus or minus 1.5% for 2013, and, beginning in 2014, SB 861 eliminated the COLA cap and bank and imposed a fixed rate of 1.25% on benefits received by retired members up to $60,000 and a fixed rate of 0.15% on retirement

income in excess of $60,000. SB 822 and SB 861 apply those new COLA rates to all PERS benefits, without regard to whether the benefits were earned before the effective dates of those provisions. Because SB 822 and SB 861 would apply to benefits earned before their effective dates, petitioners contend that SB 822 and SB 861 retrospectively modify and reduce the participating employers' contractual obligations with respect to COLA benefits and therefore impair obligations of their PERS contracts. *See Strunk*, 338 Or at 170 ("As to the determination whether newer legislation amounts to an impairment of a preexisting statutory contractual obligation, the court focused on whether the legislation would change or eliminate the state's obligation under that contract." (Citing *Eckles*, 360 Or at 399-400.)).

Respondents dispute the assertion that the COLA amendments necessarily will reduce the benefits to PERS members (and the obligations of the participating employers) and argue that SB 822 and SB 861 might, in fact, benefit some PERS members. The pre-amendment COLA depends on the Portland CPI and is variable, although it cannot go below the service retirement allowance or the OPSRP pension calculated at the time of a member's retirement. The amended COLA provision in SB 861 is a fixed COLA at 1.25% and does not depend on the Portland CPI. Respondents assert that it is possible that, under certain economic conditions where the cost of living decreases or increases a small amount only, some petitioners might be better off under the amended COLA.

We reject respondents' argument, because the record in this case does not support it. In the evidentiary hearing before the special master, the parties largely agreed on the appropriate economic assumptions to use when projecting the effect of SB 822 and SB 861 and the present value of the changes. Although the parties reached different conclusions as to the extent of the adverse financial effect on the benefits PERS members will receive, they agreed that the effect will be adverse. The contrary theoretical possibilities asserted by respondents are insufficient to overcome the evidence in the record. As a result, we agree with petitioners that SB 822 and SB 861 impair the participating employers' contractual obligations to apply the pre-amendment COLA

provisions to PERS benefits earned before the effective dates of those amendments.

Respondents further invite this court to incorporate a substantiality requirement into our standard for determining whether an asserted "impairment" is constitutionally cognizable. The impairment identified in this case—the application of the COLA amendments to benefits earned before the amendments—is, according to respondents, an insubstantial impairment and therefore should not be protected by the state Contract Clause.

In *Strunk*, the court stated expressly that whether the state Contract Clause protects parties from only "substantial" impairments remained an open question. *Strunk*, 338 Or at 206. The court did not reach the legal question of whether to impose a substantiality requirement, because the court found that, even if there were a substantiality requirement, it would be satisfied in that case. *Id.* at 206-07.

We encounter the same circumstance here. The record does not establish exactly how much money PERS members would lose if the COLA amendments were allowed to apply retrospectively. However, the record establishes that the combined effect of COLA amendments in SB 822 and SB 861 likely would be substantial. The pre-amendment COLA provision generally would add 2% per year to the value of a member's retirement benefit. With annual compounding, by the tenth year of retirement, the COLA can make up about 20% of the retirement benefit (setting aside any tax offset payments). And by the fourteenth year of retirement, under the same conditions, the COLA can make up about 30% of the retirement benefit. The record establishes that the COLA amendments would reduce petitioners' cumulative retirement benefits by about 8 to 10%. The record is therefore sufficient to establish that the impairment in this case is substantial.

Finally, respondents contend that, in this case, impairment is justified as reasonable and necessary for an important public purpose. Respondents ask us to incorporate the federal public purpose defense into the application

of the state Contract Clause. Under federal law, the public purpose defense is an extension of the reserved powers doctrine that we described earlier. *See* 357 Or at 195 n 16. Under that standard, a sufficient public purpose may justify the impairment of a state contract in two circumstances. First, the state can impair a contract if adhering to it would require the state to "surrender[] an essential attribute of its sovereignty." *United States Trust Co.*, 431 US at 23. Although it is not clear exactly what those attributes are, it is clear that they do not include that state's power to "bind itself in the future exercise of the taxing and spending powers." *Id.* at 24.

> "Whatever the propriety of a State's binding itself to a future course of conduct in other contexts, the power to enter into effective financial contracts cannot be questioned. Any financial obligation could be regarded in theory as a relinquishment of the State's spending power, since money spent to repay debts is not available for other purposes. Similarly, the taxing power may have to be exercised if debts are to be repaid. Notwithstanding these effects, the Court has regularly held that the States are bound by their debt contracts."

*Id.* Because the case before us involves the financial obligations of public employers, this case "as a threshold matter may not be said automatically to fall within the reserved powers that cannot be contracted away." *Id.* at 24-25.

Second, laws that substantially impair contracts may nevertheless be valid if the impairment is "reasonable and necessary to serve an important public purpose." *Id.* at 25. That requires, to some extent, balancing various policy considerations, but it is a balancing with the scales weighed against allowing the state to impair its own contractual obligations. "[I]n reviewing economic and social regulation, *** courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Id.* at 22-23. Nevertheless,

> "complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake. A governmental entity can always find a use for extra money, especially when taxes do not have to be raised. If a State could reduce its financial

obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all."

*Id.* at 26. In *United States Trust Co.*, the United States Supreme Court considered whether a more targeted modification to the contract would suffice and whether the states could have achieved the same policy goals through alternative means that avoided modifying the contracts completely. *Id.* at 30. According to the Court, "a State is not completely free to consider impairing the obligations of its own contracts on a par with other policy alternatives." *Id.* at 30-31.

In this case, if we were to adopt that public purpose defense, it would fail because respondents cannot eliminate, and largely do not consider, any alternative means for achieving the very loosely defined policy goals put forward. Those goals broadly relate to providing public agencies with more money to provide better public services. The briefing focuses on public safety and education.

Respondents' desire for additional funding for those services is not tied to any specifically identifiable deficiencies resulting from the current funding levels. Increasing the quality of public safety and education services is always desirable. Those are certainly appropriate targets of public concern and legislative action. Respondents point out that the COLA amendments will allow public employers to hire more teachers, police officers, and others needed to carry out those important functions. But the inquiry under the proposed public purpose defense is not what the agencies can do with additional funding; instead, the inquiry under the proposed public purpose defense is whether the current level of funding is so inadequate as to justify allowing the state to avoid its own financial obligations. The record that respondents have presented fails to establish that inadequacy.

Moreover, even if respondents had identified specific public service deficiencies resulting from the current level of funding, they have not demonstrated that those deficiencies could not be remedied through funding from other sources. Respondents assert that the state's ability to generate tax revenue is limited because it must keep taxes sufficiently

low and services sufficiently high to avoid discouraging people and businesses from moving to other states—those people and businesses are the base that the state draws taxes from. But respondents never compare Oregon's tax burden to other states. The record establishes that, in Oregon, state taxes per capita are 11.8% below the national average. And as a percent of gross state product, Oregon's taxes per capita are 14.8% below the national average. *See Strunk*, 338 Or at 207 (rejecting a similar public purpose argument because, among other reasons, "'Oregon's state tax burden currently is approximately .7 percent less than the national average'" (citation omitted)). Assuming, without deciding, that we could recognize a public purpose defense in appropriate circumstances, respondents have failed to demonstrate those circumstances here. We therefore need not adopt respondents' public purpose defense.

### 5.  *Disposition of COLA amendments*

Although we conclude that the legislature cannot change the COLA retrospectively, for PERS benefits already earned, it can change the COLA prospectively, for benefits earned by PERS members on or after the effective date of the amendments. The 2013 PERS amendments do not distinguish between those prospective and retrospective applications. That raises the issue of whether this court must hold the amendments void in whole or only to the extent that they apply retrospectively to benefits already earned.

In previous cases involving state Contract Clause challenges, we have applied the prospective/retrospective distinction, and, although concluding that retrospective application was unconstitutional, we have nevertheless upheld the statutes at issue for purposes of prospective application, even when the statutes themselves failed to distinguish between prospective and retrospective applications. *See, e.g.*, *Hughes*, 314 Or at 31 (concluding that the elimination of an obligation not to tax PERS benefits violated the Contract Clause only "as it relates to PERS retirement benefits accrued or accruing for work performed before the effective date of that [law]"); *Eckles*, 306 Or at 399 (allowing otherwise violative statute to be applied "[a]s to subsequent contracts, including renewals of [existing] contracts").

We reach the same result in this case. The prospective application of the 2013 amendments is still consistent with the legislative intent behind the amendments, because it provides employers with long-term savings, although less savings than an application that would also apply retrospectively. Therefore, PERS members who have earned a contractual right to PERS benefits by working for participating employers both before and after the relevant effective dates will be entitled to receive during retirement a blended COLA rate that reflects the different COLA provisions applicable to benefits earned at different times.[36]

Additionally, we hold that the supplemental payments provided for in SB 861 cannot be severed from the unconstitutional application of SB 861 and are, therefore, void in whole, even though the supplemental payment provision itself is not unconstitutional. Through ORS 174.040, the legislature expressed its intent that, if a statute is partially unconstitutional, then the remaining constitutional parts of the statute will "remain in force unless * * * [t]he remaining parts are so essentially and inseparably connected with and dependent upon the unconstitutional part that it is apparent that the remaining parts would not have been enacted without the unconstitutional part." ORS 174.040(2); *see also Outdoor Media Dimensions v. Dept. of Transportation*, 340 Or 275, 300-01, 132 P3d 5 (2006) (illustrating principle); *Skinner v. Davis*, 156 Or 174, 189-90, 67 P2d 176 (1937) (stating that it is "obvious" that the legislature did not intend for those remaining parts with "no application or meaning" to continue in full force and effect).

As described above, SB 861 provides retired members with up to $200 annually in supplemental payments to mitigate the impact of the reductions to the COLA benefit resulting from the amendments in SB 861. SB 861, § 8. The legislature intended the supplemental payments, which were to be paid through 2019, to lessen the short-term impact

---

[36] We do not decide, nor have we been asked to decide, the proper manner for calculating an appropriate blended rate. *See, e.g.*, ORS 238.364(5) (calculating the blended rate resulting from the tax exemption repeal by "divid[ing] the number of years of creditable service performed before [the repeal of the tax exemption], by the total number of years of creditable service during which the pension income was earned").

that the COLA amendments would have had on currently retired members or on members who will retire before 2019. Our holding in this case, which allows only the prospective application of the COLA amendments, already serves that function: the COLA rates applied to retired members will not be affected at all by the 2013 COLA amendments, and the COLA rates applied to active members who retire before 2019 will be affected only very minimally. If the supplemental payments were to continue, then the members just identified would effectively receive an increase in total benefits that the legislature did not intend; by contrast, the legislature's intent in enacting SB 861 was to reduce—not to increase—the retirement benefits being paid to those members. We therefore hold that the supplemental payment provision, SB 861, § 8, cannot be severed from the unconstitutional application of the COLA reductions in SB 861.

B.  *Other Claims*

Nonresident petitioners assert other constitutional and statutory arguments challenging the elimination of the tax offsets. Most of petitioners' remaining constitutional arguments—under the federal Contract Clause, Article I, section 10, clause 1, of the United States Constitution; and the state and federal Takings Clause, Article I, section 18, of the Oregon Constitution, and the Fifth Amendment to the United States Constitution—are disposed of based on our holding above that the tax offsets are not terms of the statutory PERS contract and that the *Stovall/Chess* settlement agreement has not been breached or impaired. *See Strunk*, 338 Or at 237-38 (disposing of similar arguments on similar grounds).

Petitioners also argue that repealing the tax offset payments based on state of residence violates the federal Privileges and Immunities Clause and federal Equal Protection Clause. The Privileges and Immunities Clause requires "substantial equality of treatment" for both residents and nonresidents of the taxing state. *Austin v. New Hampshire*, 420 US 656, 665, 95 S Ct 1191, 43 L Ed 2d 530 (1975). In this case, nonresidents are not subjected to the tax that the tax offsets are intended to offset. As a result, prohibiting payment of the tax offsets to nonresidents does not

upset the substantial equality between residents and non-residents. For similar reasons, providing the tax offsets to only those who must pay the tax does not violate the Equal Protection Clause. Residency classifications do not trigger strict scrutiny and are assessed under a rational basis review. "The Constitution does not *** presume distinctions between residents and nonresidents of a local neighborhood to be invidious. The Equal Protection Clause requires only that the distinction drawn *** rationally promote the regulation's objectives." *Arlington County Board v. Richards*, 434 US 5, 7, 98 S Ct 24, 54 L Ed 2d 4 (1977). Where the objective is to remedy damages resulting from the imposition of Oregon income tax, it is rational to provide that remedy to only those who suffer the damages by paying Oregon income tax.

Finally, petitioner Reynolds argues that eliminating the tax offsets for nonresidents violates 4 USC section 114(a), which provides, "No State may impose an income tax on any retirement income of an individual who is not a resident or domiciliary of such State (as determined under the laws of such State)." Reynolds contends that removing a tax rebate that was paid to nonresidents is the equivalent of imposing an income tax on nonresidents. Regardless of whether the tax offsets are tax rebates as to Oregon residents, they are not tax rebates as to nonresidents, because nonresidents do not pay the tax that the tax offsets would otherwise be rebating. Repealing the tax offsets does not remove a tax rebate or impose an income tax on nonresidents.

## III.   CONCLUSION

We recognize the many public policy concerns that were the impetus for the 2013 PERS amendments. When public employers have to pay higher PERS contribution rates without additional funding, they have less money to pay for *current* services provided by police officers, teachers, and other employees delivering critical services to the public. The legislature's interest in enhancing those services is entirely appropriate.

The legislature, however, must pursue those objectives consistently with constitutional requirements,

including Oregon's constitutional prohibition against impairing the obligations of contracts. We have concluded that the pre-amendment COLA provisions were part of the PERS contract and therefore are protected by the state Contract Clause. Those provisions have remained largely unchanged for 40 years. They were part of the compensation that public employees—many of whom are now retired—were promised in exchange for the work that they already have performed.

We understand that the legislature sought to structure the COLA changes in a way that was sensitive to the effect that those changes would have on retirees, by reducing the existing COLA the least for retirees with the smallest PERS benefits, while reducing the existing COLA the most for benefits above $60,000. Those can be appropriate factors to consider when determining the compensation that should be offered in exchange for services, but they do not change the employers' contractual obligations that arose when the employers offered retirement benefits that employees accepted by working for their employers.

In summary, we hold that the 1991 and 1995 income tax offsets are not part of the PERS contract and that SB 822 does not impair or breach the *Stovall/Chess* settlement agreement. Therefore, the amendments to the 1991 and 1995 income tax offsets in SB 822 do not violate the state Contract Clause or the other constitutional provisions or statutes that petitioners have raised. We further hold that SB 822 and SB 861 are constitutionally permissible insofar as they apply to benefits that members earn on or after the effective dates of those laws. But SB 822 and SB 861 unconstitutionally impair the contract rights of PERS members insofar as they apply to benefits that members earned before the effective dates of those laws. As a result, PERS members who earned benefits subject to different COLA rates will receive PERS benefits during retirement that are subject to a COLA rate that is blended to account for different COLA rates that have been earned.

Oregon Laws 2013, chapter 53, sections 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10, are declared unconstitutional under Article I, section 21, of the Oregon Constitution insofar as

they affect retirement benefits earned before May 6, 2013. Oregon Laws 2013, chapter 2, sections 1, 2, 3, 4, 5, and 6 (Special Session), are declared unconstitutional under Article I, section 21, of the Oregon Constitution insofar as they affect retirement benefits earned before October 8, 2013. Oregon Laws 2013, chapter 2, section 8 (Special Session), is declared void. Petitioners' requests for relief challenging Oregon Laws 2013, chapter 53, sections 11, 12, 13, 14, 15, 16, and 17, are denied.

**BREWER, J.,** concurring.

Although I concur in the majority's analysis and conclusions, I write separately to emphasize what I believe to be the proper framework for the statutory contract interpretation analysis in claims under Article I, section 21, of the Oregon Constitution, where the legislature has made statutory changes to retirement benefits for members of the Public Employees Retirement System (PERS). I will confine my attention to two central determinations under that analysis: First, what standards apply for identifying terms of the PERS contract; and second, what obligations do those terms provide? Because they present the more challenging issues in this case, I focus exclusively on the disputed COLA benefits.

When the PERS system is the subject of judicial scrutiny, this court's role is neither policy-setting nor managerial. Our responsibility is to interpret legislative enactments and the Oregon and United States Constitutions and to apply those sources of law to the circumstances presented in specific cases. To a significant extent, the strength of Oregon's public pension system rests on policy choices made by the other two branches of government and on their political will to satisfy prior legislative commitments to active members, retirees, and public employers. That said, because of mixed and sometimes unclear messages that this court has conveyed in some of its prior decisions, we bear a measure of responsibility for the uncertainty that the other branches have faced when, from time to time, they have reexamined the benefit structure of the PERS system. What the court can do in this case, within the inherent limitations

of the adversary system, is provide more clear guidance with respect to the governing legal principles. I commend the majority for undertaking to do so.

With that acknowledgement, I turn to the question of what standards apply for identifying terms of the PERS contract. The majority describes an overarching standard for identifying the terms of that contract in terms of "unmistakability." *See Moro v. State of Oregon*, 357 Or 167, 195, ___ P3d ___ (2015) (citing *Hughes v. State of Oregon*, 314 Or 1, 14, 838 P2d 1018 (1992) (a government contract will not be inferred from legislation that does not unambiguously express an intention to create one)); *see also Eckles v. State of Oregon*, 306 Or 380, 397-99, 760 P2d 846 (1988), *appeal dismissed*, 490 US 1032, 109 S Ct 1928, 104 L Ed 2d 400 (1989) (same).[1] It further concludes that determining whether a particular legislative assembly unmistakably intended for a benefit to be a term of the PERS contract requires an examination of statutory text and context. *Moro*, 357 Or at 203. It then sets out two guiding principles for making the determination: (1) whether the state's offer is limited to provisions that define eligibility for or the scope of remunerative pension benefits, *id.* at 204; and (2) only mandatory remunerative provisions are terms of the state's offer, *id.* at 205. The majority then ultimately concludes that the COLA cap and COLA bank provisions set out in ORS 238.360(2) and (3) (2011) are contractual promises because both provisions confer remunerative benefits and both conferrals are expressed in mandatory terms. *Id.* at 214-19. In determining that the COLA bank and COLA cap are remunerative benefits, the majority focuses on the fact that those benefits are incorporated into the statutory formula used to determine a member's service retirement allowance and that they are funded through current employer contributions, not employee contributions or investment returns. *Id.* at 216-17.

That formulation of the test—as the court has applied it in this case and others—strikes me as being more of a traditional statutory construction analysis than a

---

[1] That requirement—lack of ambiguity—applies not only to the existence of a contract, but also to "the extent of the obligation created" by the contract, that is, whether its terms encompass a particular promise. *Eckles*, 306 Or at 397.

true application of an unmistakability principle. It is traditional, but with a twist, in that it appears to set out a near-presumption that any remunerative pension benefit that is provided in mandatory statutory terms will be treated as part of the PERS contract. To be sure, the majority refers to statutory context, but it focuses primarily on the mandatory and remunerative aspects of the statutory text in arriving at its conclusion.

There is inherent tension in an approach that nods at unmistakability but actually seems to require something else. Undoubtedly, there are instances in which an enacting legislature has conferred a remunerative pension benefit in mandatory terms without fully considering the impact of that decision on the authority of future legislatures.[2] Moreover, this court employs a looser standard than unmistakability when identifying the terms of a pension contract that an employee accepts by entering into public employment. Specifically, this court has consistently held that a public pension plan is an offer for a unilateral contract that can be accepted by the tender of part performance by the employee, even without the employee's reliance on the employer's promise to provide particular benefits. *Hughes*, 314 Or at 20-21; *Taylor v. Mult. Dep. Sher. Ret. Bd.*, 265 Or 445, 451-52, 510 P2d 339 (1973) (holding that an employee had a right to retirement benefits even though the public employee "did not undertake employment *** with the expectation that she would be entitled" to the benefits and did not "continue[] her employment *** upon the expectation [that] she would receive the advantageous pension authorized" by the employer).

In short, despite its adherence to the principle of unmistakable intent, the majority has followed an approach that primarily focuses on the two questions described above: (1) does the statute confer a remunerative benefit; and (2) is that conferral expressed in mandatory terms? Because the answer to both questions in this case is yes, the majority

---

[2] And, as the majority notes, not every statutory usage of the words "shall" or "will" means that an enacting legislature meant to forever bind future legislatures to a particular benefit package. Sometimes, the use of such words can be meant merely to direct an administrative act by an executive agency.

concludes that the disputed COLA benefits are terms of the PERS contract.

None of this should come as a surprise in light of this court's construction of ORS 238.360(1) (2001) in *Strunk v. PERB*, 338 Or 145, 108 P3d 1058 (2005). In fact, unless the court were to overrule *Strunk*, any conclusion other than the one that the majority reaches would be difficult to explain. Although some tensions persist in the court's analytical framework for identifying terms of the PERS contract, I agree with the majority that defendants have not shown that this court's decision in *Strunk* should be disavowed. To the contrary, because, as elaborated below, a mandatory remunerative benefit generally is nonforfeitable once earned through the performance of work, this court's conclusion that the COLA benefit at issue in *Strunk* was a term of the PERS contract was correct.

Things get more complicated when the majority answers the next question about ORS 238.360(2) and (3) (2011), that is, what obligations did those subsections provide? As that question is posed in this case, the issue is whether the disputed COLA benefits are modifiable and, if so, to what extent? In answering that question, the majority likens those benefits to the repealed tax exemption at issue in *Hughes*. According to the majority,

> "in this case, by the time that the legislature enacted SB 822 and SB 861, modifying the pre-amendment COLA provisions, PERS members already had a contractual right to their accrued retirement benefits that would be subject to the pre-amendment COLA. *Hughes*, therefore, establishes a contractual obligation applicable in this case: Members are entitled to have the pre-amendment COLA applied to accrued PERS benefits earned before the COLA amendments went into effect."

*Moro*, 357 Or at 220. Thus, the majority concludes that COLA benefits that accrued before the amendments went into effect are not modifiable. In determining whether the disputed benefits are prospectively modifiable, the majority sets out two guidelines: (1) mandatory language is insufficient to establish nonmodifiability, *id*. at 225-26; and (2) "legislatures generally do not intend to bind future legislatures," *id*. at 226. The

majority ultimately concludes "that the COLA provisions do not include a promise to apply any specific COLA to increase retirement benefits for work that is yet to be performed." *Id*.

Note the juxtaposition here between the analyses of whether the COLA benefits are terms of the PERS contract and whether and to what extent they are prospectively nonmodifiable benefits. In answering the first question, the majority concludes that legislative use of mandatory language is critical, whereas, in answering the second, it states that the use of such language, "without more, is plainly insufficient to establish the irrevocability of an offer." *Id*. In other words, the majority holds that mandatory language is a strong indication that a remunerative benefit is contractual, but not that a remunerative benefit is prospectively nonmodifiable. That distinction is not necessarily an obvious one. Yet, it has some force.

The pivotal inquiry in deciding whether and to what extent a PERS benefit is prospectively modifiable is one of legislative intent. However, this court has not been consistent in assigning significance to a determination of actual legislative intent in the modifiability analysis. In *Oregon State Police Officers' Assn. v. State of Oregon*, 323 Or 356, 375-76, 918 P2d 765 (1996) (*OSPOA*), for example, the court held—without engaging in a traditional statutory construction analysis—that PERS members irrevocably were entitled to the employer "pick-up" benefit of the statutory contract upon their initial acceptance of employment. *Id.* at 376 (because "[t]he six percent pick-up is an integral part of the underlying PERS pension contract," its unilateral termination "materially changes that underlying pension contract to plaintiffs' detriment and, thus, frustrates plaintiffs' reasonable reliance on the offer the state made to them and which they accepted by the tender of part performance"). In *Hughes* and *Strunk*, on the other hand, the court examined each pertinent statutory provision in detail to determine the existence and extent of a legislative promise not to modify remunerative benefits. I agree with the majority that it is virtually impossible to reconcile those distinct approaches.

To resolve the tension in this court's decisions, it is essential to clarify both the role of the text and context

of a statutory promise and the role of general employment contract principles in determining the prospective modifiability of a PERS benefit. In *Hughes*, the relevant statutory text drew a line between benefits that had accrued or were accruing and those that had not yet accrued. *See* 314 Or at 7. That factor played an important role in the court's analysis. *Id.* at 20, 27-28. However, in resolving the plaintiffs' claim, this court did not rely solely on that text or its statutory context. In addition, it referred to contract principles that it purported to draw, in part, from an Oregon Attorney General's opinion:

> "Oregon's Attorney General articulated this contractual nature of pension benefits as follows:
>
> "'Employee pension plans, whether established by law or contract, create a contractually based vested property interest which may not be terminated by the employer, *except prospectively*. The employer offers payment of future pension benefits as part of compensation for work currently performed. Employees accept and earn such future benefits by performing current labor.' 38 Op Att'y Gen 1356, 1365 (1977)."

*Hughes*, 314 Or at 20-21 (emphasis in *Hughes*).

Interestingly, the authority that the Attorney General cited for the quoted proposition was drawn from this court's decision in *Taylor*, 265 Or at 454:

> "As applied to the present circumstances, [the] plaintiff's tender of the contributions and acceptance of the plan terminated [the] defendants' power to revoke the offer, and [the] plaintiff would be entitled to the benefits of the plan if she continued to work for the requisite period necessary for retirement."

That conclusion does not support the proposition for which the court in *Hughes* cited the Attorney General's opinion.[3]

---

[3] Nor do principles used in determining whether the obligation of a contract has been unconstitutionally impaired directly support the proposition set out in *Hughes*. The question here is not whether a retroactive modification of the COLA promises in the PERS contract would be unconstitutional, but whether those promises—either by their own terms or based on contract principles—are prospectively modifiable. It was the issue of unconstitutionality, not statutory contract interpretation, that this court briefly addressed in *State ex rel. Thomas v. Hoss*, 143 Or 41, 21 P2d 234 (1933), a decision to which the majority devotes

However, there is other authority from this court that does support the principle of prospective modifiability set out in *Hughes*.

In the absence of an agreement to the contrary, an employer generally has the right to modify employment benefits—if they have not been earned by previous service. *State ex rel Roberts v. Public Finance Co.*, 294 Or 713, 716-19, 662 P2d 330 (1983). And, an employee ordinarily impliedly accepts a modification in the terms of employment by continuing employment after the modification takes effect. *Mail-Well Envelope Co. v. Saley*, 262 Or 143, 152, 497 P2d 364 (1972); *Page v. Kay Woolen Mill Co.*, 168 Or 434, 439, 123 P2d 982 (1942). In short, employment benefits that are accredited and accumulate as service is performed generally are prospectively modifiable unless the employer's promise is more durable.

This court somewhat regularly—if not consistently—has applied that general employment contract principle in the public employment benefit setting. In *Harryman v. Roseburg Fire Dist.*, 244 Or 631, 420 P2d 51 (1966), for example, the defendant employer adopted a sick leave policy that provided for cash in lieu of accumulated sick leave upon termination from employment. The plaintiff employee had accumulated 47 days of sick leave when the employer revoked the policy. Sometime after that revocation, the employee was terminated. When the employee requested the cash in lieu of his accumulated 47 days of sick leave, the employer refused, contending, among other things, that it

some attention. *Moro*, 357 Or at 199-201, 220. This court in *Hughes* mentioned *Thomas* in a footnote:

"In that case, this court held that the plaintiff's salary earned before the effective date of a 1933 law, which reduced employees' salaries, could not be affected by the law because of the Contract Clause of Article I, section 21, of the Oregon Constitution. The court held, however, that the then-new law could reduce plaintiff's salary prospectively. 143 Or at 47."

*Hughes*, 314 Or at 29 n 33. In its own words, this court in *Thomas* held that "after a salary has been earned[,] the public employee's right thereto becomes vested and cannot be taken away by any legislation thereafter enacted." *Thomas*, 143 Or at 47. Although that holding recognized the constitutional distinction between retroactive and prospective modification of remunerative employment benefits, the court in *Thomas* did not discuss the statutory construction or contract principles underlying that distinction, much less consider how to determine whether, by its terms, a benefit is prospectively modifiable.

was not obligated to pay because the sick leave policy had been revoked before the employee's termination. This court held that the employer could not escape its obligation to comply with its promise to pay sick leave:

> "When plaintiff entered upon his employment with defendant he was advised that he would receive an allowance for accumulated sick leave upon termination of employment. He accepted employment upon the assumption that the allowance for sick leave was a part of his compensation for services. Since it was a part of the inducement to accept employment, it can be regarded as a contractual term of plaintiff's employment. Defendant could not, therefore, deprive plaintiff of the allowance *after he had earned it*."

*Id.* at 634-35 (footnote omitted; emphasis added).

Later, in *Strunk*, this court rejected the petitioners' argument that their rights to certain retirement benefits became irrevocable when they began employment:

> "In their reply brief, petitioners also argue that this court's decision in [*Taylor*] 'is a much more pivotal case in this court's developing analysis of pension benefits than is *OSPOA*.' In *Taylor*, which involved a county retirement system, the court acknowledged that 'contractual rights can arise prior to the completion of the service necessary to a pension.' 265 Or at 451. Of course they can. The predicate question—which we determine to be dispositive in these cases—is whether the contract offer that the particular pension plan presents contains such a promise, *i.e.*, a promise that extends over the life of a covered member's service."

338 Or at 192 n 40 (emphasis omitted). Thus, this court has applied—in public employment benefit settings generally and in determining the nature and extent of obligations included in the statutory PERS contract—the contract principle that remunerative benefits that are earned and accumulate as service is performed are prospectively modifiable unless the employer's initial offer of employment included a different promise, for example, a promise that extends over the life of the employee's service.[4]

---

[4] As an example of such a promise, the parties to an employment agreement can agree—expressly or by implication—at the outset of employment that the employer will not modify or eliminate an employee's eligibility for benefits in the future. In *Taylor*, the defendant employer adopted a retirement benefits policy

As can be seen from the foregoing discussion, identifying the nature and extent of an obligation of the PERS contract requires the application of statutory construction principles because PERS is a legislative contract. That inquiry also involves the application of employment contract principles, to the extent that a statutory construction analysis does not fully identify the nature and extent of the parties' rights and obligations. The beginning place, though, is the statute itself. *See Arken v. City of Portland*, 351 Or 113, 139, 263 P3d 975 (2011), *adh'd to on recons sub nom Robinson v. Public Employees Retirement Board*, 351 Or 404, 268 P3d 567 (2011) (so holding).

To set the stage for the application of those principles to the COLA benefits in this case, there must be a common understanding of three key concepts: first, what it means for a PERS member to be "vested"; second, how benefits are earned; and third, what it means for earned benefits to "accrue." The answers to each of those questions will vary depending on the terms of the contract and the nature of the promised benefit.

As used in the PERS statutes, "vest" is a term that refers to a member's irrevocable eligibility to receive benefits. For Tier One and Tier Two employees, "vested means being an active member of the system in each of five calendar years." ORS 238.005(30).[5] A member who is not vested can suffer a forfeiture of benefits if the conditions for eligibility

---

that applied to the plaintiff employee's position. The employee continued working for the employer for nine months, at which time the employer amended the retirement policy to exclude the employee's position. When the employee claimed the right to participate in the retirement plan, the employer refused, arguing that, among other things, the amendment of the retirement policy precluded her participation in it. This court disagreed, holding that the policy included an irrevocable promise (or offer) that the employee would be able to vest in benefits and that the employee had accepted the offer by undertaking to perform the vesting condition of long-term service. *Taylor*, 265 Or at 450-51. *Taylor* had nothing to do with the prospective modifiability of a benefit. Rather, it was about vesting. The benefit remained available for eligible employees; it simply was impermissibly revoked with respect to the plaintiff.

  [5] For OPSRP members, vested status is more restrictive. ORS 238A.115 provides, in part:

    "(1) Except as provided in subsection (2) of this section, a member of the pension program becomes vested in the pension program on the earliest of the following dates:

are not fulfilled. Thus, for example, ORS 238.095(2) provides, generally speaking, that "an inactive member ceases to be a member of the system if the member is not vested and is inactive for a period of five consecutive years." On the other hand, if an inactive member

> "who is a vested member of the system and who has not attained earliest service retirement age is separated, for any reason other than death or disability, from all service entitling the employee to membership in the system, the member account, if any, of the member shall remain to the member's credit in the fund unless the member elects to withdraw it and there shall be paid such death benefits as this chapter provides; or a disability retirement allowance or, after attaining earliest service retirement age, a service retirement allowance, either of which shall consist of the allowance provided in ORS 238.300, but actuarially reduced based on the member's then attained age."

ORS 238.425. Thus, the statutory meaning of "vest" in the PERS system refers to a member's irrevocable eligibility to receive retirement benefits. That meaning is consistent with the concept of vesting as this court described it in *McHorse v. Portland General Electric*, 268 Or 323, 331, 521 P2d 315 (1974):

> "[I]t would seem that in the situation where the employee has satisfied all conditions precedent to becoming eligible for benefits under a plan, the better reasoned view is that the employee has a vested right to the benefits. This view sees the employer's plan as an offer to the employee which can be accepted by the employee's continued employment, and such employment constitutes the underlying consideration for the promise."

Vesting must be distinguished from the earning of benefits. To "earn" means "to receive as equitable return for work done or services rendered" or to "have accredited to one as remuneration." *Webster's Third New Int'l Dictionary* 714 (unabridged ed 2002). To "remunerate" means to "pay an

---

"(a) The date on which the member completes at least 600 hours of service in each of five calendar years. The five calendar years need not be consecutive, but are subject to the provisions of subsection (3) of this section.

"(b) The date on which an active member reaches the normal retirement age for the member under ORS 238A.160."

equivalent for" or to "compensate." *Id*. at 1921. Thus, to say that a member is vested in the PERS system does not determine the amount of benefits that a member has earned—either at retirement or upon earlier termination of membership in the system—as compensation for services rendered. That determination depends on how and the extent to which the benefits have been accredited to a member over time, that is, to what extent the benefits have "accrued." *See id*. at 13 (defining "accrue" as "to be periodically accumulated in the process of time"). In most employment relationships, including in the PERS system, an employee receives credit for and accumulates compensation and other remunerative benefits based on the incremental performance of service. Thus, ordinarily, a vested PERS member will earn and accrue more benefits the longer he or she works.

Unfortunately, this court in *OSPOA* did not carefully distinguish among the concepts of vesting and the earning and accrual of benefits, when, among other things, it said:

> "Most jurisdictions adhering to a contract theory of pensions construe pension rights to vest on acceptance of employment or after a probationary period, with vesting encompassing not only work performed but also work that has not yet begun."

323 Or at 371. Vesting generally does not encompass "work that has not yet begun" in the sense that it necessarily entitles a member to earn benefits by performing future work. Rather, as discussed, vesting refers to a PERS member's irrevocable eligibility to receive benefits under the terms of the statutory contract. And, also as discussed above, in the absence of a promise to provide a benefit that extends over the life of a covered member's service, the legislature prospectively may modify a PERS benefit if it has not yet been earned.

With those principles in mind, I turn to the question of whether defendants' promises to provide the COLA cap and COLA bank benefits extend over the life of plaintiffs' service and, therefore, are nonmodifiable. As will be shown, the statutory text and context of ORS 238.360(2) and (3) (2011) describe how the disputed COLA benefits are

earned and accrued, but they contain no promise of prospective irrevocability. Under ORS 238.360(2) and (3) (2011), a public employer's COLA cap and COLA bank obligations are directly tied to a member's monthly and annual retirement allowances. A member's service retirement allowance based on the life pension component that is at issue in these cases is calculated from a formula that includes as its only variables the member's number of years of membership in PERS and his or her "final average salary." ORS 238.300(2)(a)(B).[6] A member's number of years of membership accumulates as work is performed; thus, that variable is directly tied to earned and accrued remuneration for past service. However, the other retirement allowance variable, the member's "final average salary," is not so easily characterized, at least with respect to active members. "Final average salary" means the greater of the following:

> "(a) The average salary per calendar year paid by one or more participating public employers to an employee who is an active member of the system in three of the calendar years of membership before the effective date of retirement

---

[6] ORS 238.300 provides, in part:

"Upon retiring from service at normal retirement age or thereafter, a member of the system shall receive a service retirement allowance which shall consist of the following annuity and pensions:

"* * * * *

"(2)(a) A life pension (nonrefund) for current service provided by the contributions of employers, which pension, subject to paragraph (b) of this subsection, shall be an amount which, when added to the sum of the annuity, if any, under subsection (1) of this section and the annuity, if any, provided on the same basis and payable from the Variable Annuity Account, both annuities considered on a refund basis, results in a total of:

"(A) For service as a police officer or firefighter, two percent of final average salary multiplied by the number of years of membership in the system as a police officer or firefighter before the effective date of retirement.

"(B) For service as other than a police officer or firefighter, including service as a member of the Legislative Assembly, 1.67 percent of final average salary multiplied by the number of years of membership in the system as other than a police officer or firefighter before the effective date of retirement.

"* * * * *

"(c) As used in this subsection, 'number of years of membership' means the number of full years of creditable service plus any remaining fraction of a year of creditable service. Except as otherwise provided in this paragraph, in determining a remaining fraction a full month shall be considered as one-twelfth of a year and a major fraction of a month shall be considered as a full month."

of the employee, in which three years the employee was paid the highest salary. The three calendar years in which the employee was paid the largest total salary may include calendar years in which the employee was employed for less than a full calendar year. If the number of calendar years of active membership before the effective date of retirement of the employee is three or fewer, the final average salary for the employee is the average salary per calendar year paid by one or more participating public employers to the employee in all of those years, without regard to whether the employee was employed for the full calendar year.

"(b) One-third of the total salary paid by a participating public employer to an employee who is an active member of the system in the last 36 calendar months of active membership before the effective date of retirement of the employee."

ORS 238.005(9).

Insofar as retired members are concerned, both variables that determine the amount of COLA benefits—number of years of membership and final average salary—are directly attributable to their performance of pre-retirement service. Based on the holdings in *Hughes* and *Strunk*, those members have fully earned and accrued the disputed COLA benefits. The tax-exemption repeal in *Hughes* involved a change that, in violation of ORS 237.201 (1989), would have eliminated an earned benefit if it applied to previously performed service. *Hughes*, 314 Or at 31. The situation in *Hughes* was analogous to the challenge to the COLA amendment in *Strunk* in the sense that the amendment in *Strunk* applied to only certain retirees who had fully earned and accrued the benefit at issue there through previous service. *Strunk*, 338 Or at 221-24. Similarly, in this case, retired employees have fully earned and accrued the disputed COLA benefits based on their number of years of membership and their final average salaries. Accordingly, in my view, *Hughes* and *Strunk* control the analysis here with respect to retired PERS members. With respect to those members, the disputed COLA benefits are not modifiable at all.

The analysis for active members is somewhat different. Because those members will continue to earn and accrue COLA benefits as they perform future service, it is

necessary to determine whether the enacting legislature intended to preclude future legislatures from modifying their COLA benefits prospectively. Apart from the use of mandatory language, I discern nothing in the text or context of ORS 238.360 (2011) that indicates such an intent.

Calculating final average salary for a member who has not retired is, by definition, impossible. The question is what, if any, significance attaches to that fact in the modifiability analysis. The answer, in my view, is not much. Active members accumulate years of membership and, through past service, they also have the functional equivalent of a pre-amendment final average salary. Thus, in substance, the statutory variables that determine a retired member's COLA benefits also exist, at least in proxy form, for active members. A proxy amount for final average salary, when coupled with an active member's number of years of membership to the effective date of the statutory amendment, will result in a proportionately protected COLA benefit upon retirement. Nothing about the lack of a final average salary for active members suggests that the enacting legislature intended for the disputed COLA benefits to be prospectively nonmodifiable with respect to those members.

It follows, based on the gap-filling contract principles set out in *Hughes* and *Strunk*, that, in the absence of a legislative promise that the disputed COLA benefits would not be modified prospectively, the 2013 amendment to ORS 238.360(2) and (3) did not breach the PERS contract with respect to benefits to be earned and accrued by active members after the effective date of the amendment.

That conclusion is consistent with the broader statutory framework of the PERS system. In particular, ORS 238.600 provides:

> "(1) A system of retirement and of benefits at retirement or death for employees of public employers hereby is established and shall be known as the Public Employees Retirement System. The Public Employees Retirement System consists of this chapter and ORS chapter 238A. It is the intent of the Legislative Assembly that the system be qualified and maintained under sections 401(a), 414(d) and 414(k) of the Internal Revenue Code as a tax-qualified defined benefit governmental plan.

> "(2) If the Public Employees Retirement System is terminated, or if contributions may no longer be made to the system, each member of the system has a nonforfeitable right to the benefits that the member *has accrued as of the date of the termination, or as of the date that contributions may no longer be made to the system,* to the extent that those benefits are funded."

(Emphasis added.) Subsection (2) was added to ORS 238.600 by the 1999 Legislative Assembly. 1999 Or Laws, ch 217, § 9. At a hearing before the House General Government Committee on May 18, 1999, Steve Delaney, the legislative liaison for PERS, testified that the bill was intended to ensure that the PERS system was in compliance with the Employee Retirement Income Security Act (ERISA), 29 USC § 1001 *et seq.*, and the tax exemption requirements of the Internal Revenue Code (IRC) for qualified retirement plans.

I recognize that, as a subsequently enacted statute, ORS 238.600(2) does not indicate what, if anything, the 1971 and 1973 Legislative Assemblies intended with respect to the prospective modifiability of the earliest statutory COLA benefit provisions. *See Holcomb v. Sunderland*, 321 Or 99, 105, 894 P2d 457 (1995) ("The proper inquiry focuses on what the legislature intended at the time of enactment and discounts later events."). Furthermore, as this court noted in *Strunk*, it is particularly important to ascertain the intent of the correct legislature when analyzing statutes to determine their contractual nature and extent because "the fundamental purpose behind such contracts is to bind future legislative action." *Strunk*, 338 Or at 189. Moreover, because this case does not involve a plan termination, ORS 238.600(2) is not directly relevant. That said, the relationship between the PERS system and federal pension and tax law requirements is critical to the viability of the system, and, significantly, nothing in the legislative history of ORS 238.600(2) indicates that the 1999 Legislative Assembly thought that its enactment constituted a substantive change in the benefit structure of that system. Accordingly, the fact that that provision states that "accrued" PERS benefits are nonforfeitable in the event of a plan termination provides a lens through which to assess the prospective modifiability

of the disputed COLA benefits in this case. For that reason, I briefly discuss the relationship between ORS 238.600(2), ORS 238.360, and the anti-cutback requirements of federal law.

Because ORS 238.600(2) was enacted to comply with federal law, its use of the concept of "accrued" benefits must be understood in light of the meaning of that term under ERISA. As will be shown, the meaning of "accrued benefits" under ERISA generally comports with the idea, expressed above, that PERS benefits accrue—that is, accumulate periodically—as they are earned through the performance of covered service.

The central purpose of ERISA is to protect "employees' justified expectations of receiving the benefits their employers promise them." *Central Laborers' Pension Fund v. Heinz*, 541 US 739, 743, 124 S Ct 2230, 159 L Ed 2d 46 (2004). Thus, ERISA's anti-cutback rule prohibits pension plan amendments that decrease plan participants' "accrued benefits." 29 USC § 1054(g) (2006); *see also Central Laborers'*, 541 US at 744. The anti-cutback rule also appears in the Internal Revenue Code in materially identical form and disqualifies from tax-exempt status pension plans that violate its conditions. IRC § 411(d)(6); *see also* IRC § 401(a) (defining a qualified pension plan under ERISA); IRC § 411(a) (disqualifying from coverage under IRC § 401(a) pension plans which do not provide that an employee's rights to normal retirement benefits be "nonforfeitable"); IRC § 501(a) (granting tax-exempt status to qualified pension plans). The parallel ERISA and IRC provisions serve the same function, which is to safeguard benefits that an employee has earned over time by fulfillment of a plan's conditions. *See Central Laborers'*, 541 US at 743, 746. Once a participant performs work in exchange for a promised benefit, that is enough, other things being the same, to generate the sort of "justified expectation[]" that the anti-cutback rule is designed to protect. *Id*. at 743.

Because only an "accrued benefit" is protected by the anti-cutback rule, the scope of the rule depends on the meaning of that term. In relevant part, the IRC defines an "accrued benefit" under a defined benefit plan as "the

employee's accrued benefit determined under the plan and
\* \* \* expressed in the form of an annual benefit commencing
at normal retirement age." IRC § 411(a)(7)(A)(i). Under the
federal scheme, a promised benefit must correspond to cur-
rent employment in order for that benefit to "accrue[]," just
in the sense that the promise of a benefit must predate an
individual's retirement or termination. *See, e.g., Williams v.
Rohm & Haas Pension Plan*, 497 F3d 710, 714 (7th Cir 2007)
(holding that COLA was an "accrued benefit" where promise
of COLA predated the plaintiffs' retirement). Where, under
state law, a COLA benefit is tied to a member's earned and
accrued monthly retirement allowance as a means for main-
taining the real value of the allowance, the COLA is a part of
the accrued benefit under ERISA that ordinarily cannot be
decreased after the employee has earned it through service
to which it is attributable. *See* 29 USC § 1054(g)(1); *Sheet
Metal Workers' Nat'l Pension Fund v. CIR*, 318 F3d 599, 603
(4th Cir 2003) ("accrued benefit" accumulates during an
employee's service so as to become part of employee's legiti-
mate expectations at retirement under the terms of the plan
then in effect).

      The COLA cap and COLA bank benefits provided
by *former* ORS 238.360(2) and (3) (2011) accumulate based
on a member's number of years of membership in PERS and
the member's final average salary. They are inseparably
tied to a member's service retirement allowance as a means
of maintaining the real value of that benefit. Therefore, the
disputed COLA benefits are "accrued" and nonforfeitable for
purposes of ORS 238.600(2), but only insofar as they are
attributable to service performed by a member before the
effective date of the 2013 Legislative Assembly's amend-
ment to ORS 238.360(2) and (3).

      To summarize: Retired PERS members have fully
earned and accrued the disputed COLA benefits based on
their number of years of membership and their final average
salaries. Accordingly, the disputed benefits are not modifi-
able with respect to those petitioners who are retired mem-
bers. In addition, active members have earned and accrued
the disputed COLA benefits based on their number of years
of membership and a proxy for their final average salaries on
the effective date of the 2013 amendment to ORS 238.360(2)

and (3). However, in the absence of a legislative promise not to prospectively modify those benefits, the 2013 COLA amendment did not breach—let alone impair—active members' contractual rights to COLA benefits with respect to service performed after the effective date of the amendment.

I join in the majority's analysis of the other issues in this case. Accordingly, I respectfully concur.